**Esther ATCHERSON, Plaintiff,**

v.

**Hon. Judge John SIEBENMANN, Defendant.**

Civ. No. 76–33–D.

United States District Court,
S. D. Iowa,
Davenport Division.

Sept. 7, 1978.

**528**

Gordon E. Allen, Director, Civil Liberties Union, Des Moines, Iowa, for plaintiff.

Stephen C. Robinson, Sp. Asst. Atty. Gen., Des Moines, Iowa, for defendant.

### ORDER

STUART, Chief Judge.

Magistrate Longstaff's Memorandum Opinion filed in the above-entitled action on September 1, 1978 is before the Court for review. The Court finds that said opinion was rendered after a full trial before the Magistrate with the consent of the parties under a stipulation executed January 13, 1978. The Court has examined said opinion for manifest error and has found none. However the Court has some concern with the use of the term "ministerial". The Court therefore amends the Magistrate's Memorandum Opinion and Order as follows:

1. The last complete sentence on page 534 of the Memorandum Opinion is stricken and the following sentence is inserted in lieu thereof:

> Such absolute immunity, however, extends only to judicial actions and does not include nonjudicial activities.

The citations which follow shall remain.

2. The word "ministerial" in the first line of the second complete paragraph on page 535 is stricken and the word "nonjudicial" is inserted in lieu thereof.

Therefore, the Court adopts the Magistrate's Memorandum Opinion as herein amended as that of the Court and hereby authorizes and directs the Clerk of the Court to enter judgment pursuant thereto.

1. On August 4, 1978 Defendant filed an amendment to his final argument by directing the Court's attention to *Butz v. Economou*, ——

### MEMORANDUM OPINION AND ORDER

R. E. LONGSTAFF, United States Magistrate.

Plaintiff, Esther Atcherson, a former deputy probation officer with the Johnson County, Iowa, Juvenile Probation Office, brought this action pursuant to the Civil Rights Act of 1871, Title 42 U.S.C. § 1983, alleging deprivation of certain constitutional rights arising under the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment. Jurisdiction of this Court is premised upon Title 28 U.S.C. §§ 1331 and 1343. Specifically, Plaintiff contends that because of the exercise of her First Amendment right of free speech, her employment was terminated by the Defendant in his exercise of authority under Section 231.8 Iowa Code (1975).

On January 13, 1978 the parties to the above-entitled action consented to trial of the case to the undersigned United States Magistrate. Trial was held on July 17 and 18, 1978. Mr. Gordon E. Allen, Legal Director, Iowa Civil Liberties Union, appeared for the Plaintiff. Mr. Stephen C. Robinson, Special Assistant Attorney General, State of Iowa, appeared for the Defendant. Pursuant to the Court's direction, written final arguments were filed on August 1, 1978.[1]

### Findings of Fact

Plaintiff, Esther Atcherson, is a resident of Johnson County in the State of Iowa. On October 1, 1967, she became a deputy probation officer with the Johnson County Juvenile Probation Office. Initially, Plaintiff was a half-time employee. She later was promoted to three-quarter time and was employed on a full-time basis for 17 months prior to May 5, 1975, at which time Plaintiff submitted a letter of resignation.

Defendant, Hon. Judge John Siebenmann, assumed his duties as an elected Mu-

U.S. ——, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), on the issue of absolute and implied immunity.

nicipal Court Judge on January 1, 1972 in and for Linn County. On September 1, 1973 he was appointed by the Chief Judge of the District to serve as the full-time Juvenile Court Judge for the Sixth Judicial District of Iowa, including Jones, Linn, Johnson, Benton, Iowa and Tama Counties. In August of 1977 Judge Siebenmann was transferred back to Cedar Rapids to serve in Linn County Court where his present assignment is rotational from small claims, simple misdemeanors and traffic cases. The Defendant was at all times material hereto the Juvenile Court Judge for Johnson County. In that capacity, Defendant was the hiring and firing authority over the Juvenile Probation Officers and also possessed the authority to set salaries, pursuant to Section 231.8 Iowa Code (1975), which reads in pertinent part: ". . . All probation officers so appointed shall serve at the pleasure of the juvenile court judge or judges."[2] Judge Siebenmann was thereby vested with the final administrative authority over the Probation Office. The Chief Probation Officer, H. A. Wickes, reported to the Judge on a regular basis.

The Johnson County Probation Office, during the time at issue, consisted of the Chief Probation Officer, Mr. Wickes, two Deputy Probation Officers, Jerry Smithey and the Plaintiff, and a secretary, Ruth Steele. Members of the staff reported to Mr. Wickes who then reported directly to Judge Siebenmann.

Given the size of the Johnson County Probation Office, it was operated on a generally informal basis. Wickes made case assignments, but from that point the deputies operated on their own. There were no written office guidelines until August 15, 1974.[3]

Plaintiff Atcherson was a well-qualified Probation Officer with a recognized dedication to her profession, and to the juveniles under her supervision. However, she possessed an aggressive personality that tended to promote friction in her dealings with other professional people involved in the care of the juveniles. This aggressiveness, although often well-intentioned and on behalf of juveniles under her supervision, created conflict between the Plaintiff and Mr. Wickes, the office of the County Attorney, and the Department of Social Services.

While the Plaintiff was decisive and tended to take charge, her immediate superior, Mr. Wickes was indecisive and tended to seek advice and counsel of Judge Siebenmann and others on the most routine matters. Wickes often complained to Judge Seibenmann that he had difficulty dealing with his deputy, Esther Atcherson. This difficulty was created both by the Plaintiff's aggressiveness and Mr. Wickes' weaknesses as an administrator and supervisor.

Defendant, Judge Siebenmann, met with Mr. Wickes each week to discuss Probation Office administrative and personnel problems. The meeting was usually a luncheon at which Wickes would report to Judge Siebenmann regarding the operation of the Probation Office. Wickes complained of difficulty with the Plaintiff at the initial meetings and continued to so complain throughout the time relevant to this case. Judge Siebenmann obtained nearly all of his information regarding the Plaintiff's performance from Wickes. The Judge made no independent investigation of any kind.[4] Because his schedule was taken up

---

2. Section 231.8 Iowa Code (1975) was later amended by the Legislature to place the authority in the hands of a probation officer committee. However, the issue remains before the Court as stated in the Court's Order of October 1, 1976.

3. See the text infra at p. 530.

4. Judge Siebenmann testified as follows:

Q. As a party to the proceeding, have you had a chance to examine the deposition taken of Mr. Wickes?

A. Yes, I have read it over recently.

Q. It came as no surprise to you that he indicated in that deposition that no formal written evaluations of deputy probation officers were undertaken in the probation office by him?

A. Right.

Q. There were no formal evaluation conferences with you and the deputy probation officers?

A. Right.

Q. In fact, the information upon which you relied with reference to the performance from

530

with other matters, Judge Siebenmann relied completely on the reports of Wickes that Plaintiff Atcherson had refused Wickes' direct orders when she disagreed, that she kept poor records, that she had made an unauthorized trip to St. Louis, and that she was insubordinate. Those reports are not supported by the record in this case.

As well as these general allegations of misconduct by the Plaintiff, there were specific incidents set out as evidence of the Plaintiff's inappropriate behavior. Those incidents include deletion of a portion of a psychological report to the juvenile court, a memorandum written by the Plaintiff to the local Department of Social Services, and a letter written to an assistant county attorney.

In July of 1974 the Plaintiff submitted a report to the Court concerning a male juvenile in which the Plaintiff had deleted a portion of the psychological report. The juvenile court (a judge other than the Defendant) was disturbed about the deletion and found it to be highly improper to conceal some of the information in the psychological report from the counsel in the case. Plaintiff Atcherson had not previously edited such a report and, although she was not informed at the time it was improper procedure or disciplined in any way, she did not do so subsequently.

In her communication with other agencies dealing with juveniles, such as the Department of Social Services, the Plaintiff was often· less than tactful in her observations and criticism. One particular memorandum the Plaintiff sent the Department of Social Services was characterized as insulting by Judge Siebenmann. The memorandum was a harsh criticism of the job a social worker was doing.[5]

On August 15, 1974, a memorandum on office policy was issued by the Chief Probation Officer, Wickes, after it was approved by the Defendant. That memorandum was issued in response to difficulties Wickes was having with his deputy, the Plaintiff. It was the first statement of office policy made in any written form. The memorandum addressed general operating procedures, scheduling of regular conferences on cases, and the channeling of all out-going materials through the Chief Probation Officer, Mr. Wickes. Item 10 in the memorandum stated "All interagency correspondence will be channelled across the desk of the CPO for notation with the exception of previously approved reports, etc." and was directly in response to the memorandum Plaintiff had sent to the Department of Social Services, discussed above.

Plaintiff complied with the directives of the August 15, 1974 memorandum in her future activities in the Probation Office. The only incident claimed as a reason for seeking the Plaintiff's resignation which occurred subsequent to the August 15, 1974 memorandum was a letter she wrote in reply to a letter from Assistant County Attorney Daniel Bray. In order to discuss that incident, the Court must trace some history of a girls' group home with which the Plaintiff was involved.

the deputy probation officers came exclusively from Mr. Wickes?
A. I think pretty much so, and also my contact with the officers as well.
Q. It's true or fair to say that your contact with Esther Atcherson, however, was exclusively in the performance of her deputy probation officer duties before you on a particular case. That is to say, you never had her in for a conference to discuss her performance as a probation officer with reference to the many problems Mr. Wickes related to you?
A. No, I didn't seek an initial conference with her directly as to what her performance was in that respect. I was there just on Fridays, and

usually my court schedule—hearing schedule was pretty full most of those Fridays.
Q. Nor did you have any type of three way conference with Esther, Mr. Wickes, and yourself to discuss Esther's performance as opposed to a particular case?
A. I don't think with regard to any specific conduct of the plaintiff. I think we had lunch a few times with her present. It was much more often I was with Mr. Wickes, however.

5. This memorandum was written sometime prior to August 15, 1974. It has not been produced for this litigation. The contents have been deduced from the testimony of the parties.

During the course of her employment Plaintiff prepared materials for application for federal funding of a girls' group home, which application was ultimately approved by the Johnson County Board of Supervisors and the Iowa Crime Commission. With funds from the grant, Johnson County purchased a residence to be used for the group home. The premises was a pre-existing halfway house which terminated its program, thus making the facilities available.

The girls' group home was an emergency shelter facility in Iowa City. It received per diem funding from the Law Enforcement Assistance Administration and the State of Iowa.

Plaintiff, Esther Atcherson, assisted in locating the property for the group home, and she continued to work on program development. The Probation Office was involved in the group home project, but the direct responsibility for that involvement went to the Plaintiff. She maintained records and bookkeeping on the group home and a bank account with the First National Bank of Iowa City. The bank account was used as a conduit for general expenses and was established by a monthly warrant for $350 from Johnson County.

The Plaintiff's testimony that she did not recall a bank account presents a serious question concerning her credibility. However, her April 11, 1975 letter to Daniel Bray states that such a bank account was maintained, and that letter was introduced by the Plaintiff as an exhibit in this case. Although the Court finds no attempt to conceal information regarding the bank account, this was certainly a serious lapse of memory for a person of the Plaintiff's intelligence.

At some later time, the corporation which operated the halfway house, the previous tenant on the premises of the group home, dissolved its assets. After paying expenses,

the corporation had a balance of $1000. The corporation made a decision to donate the $1000 to the girls' group home as a project with goals similar to those of the halfway house. A check in that amount was drafted, made payable to the girls' group home, and delivered to the Plaintiff in mid to late March of 1975.

In an effort to determine how the group home could legally accept the check from the halfway house corporation, and thereby apply the funds to special needs of the girls not allowed under the County warrant, Plaintiff Atcherson contacted Assistant County Attorney Daniel Bray by phone. In that telephone conversation the Plaintiff gave Bray a small amount of information concerning the home. Although Daniel Bray was the Assistant County Attorney concerned with the juvenile court, he had previously been unaware of the group home.[6]

Plaintiff Atcherson told Bray that the group home was a project the Probation Officers, including Wickes, Smithey and the Plaintiff, were operating. She stated that the County picked up the financial overrun on the group home. She did not say the project was a purchase of service agreement with the County. Bray initially thought the Plaintiff was describing a privately operated group home run by the three Probation Officers on a contract with the County. On that basis he suggested they might want to incorporate in order to accept the donation. But Bray stated he would look into the matter and issue a formal opinion later.[7]

As a result of her conversation with Bray, the Plaintiff wanted to know something about incorporation and sent for some articles of incorporation. After she had received the articles of incorporation in return mail and was reviewing them, Mr.

---

**6.** The attorneys who preceded Daniel Bray as the Assistant County Attorney assigned to the juvenile court matters, Pat Kamath and Candy Morgan, were very much aware of the group home project. Bray had been in the position for about 3 months at the time of considering this issue.

**7.** The Stipulation of the parties states the opinion was sought on or about April 10, 1975, which is the date of the opinion letter. The facts do not support that stipulation.

Wickes reported to Mr. Bray that the Plaintiff was already writing articles of incorporation, and that Wickes and Smithey were in no way involved with the group home.

On April 10, 1975 Daniel Bray issued a written opinion letter in regard to the proposed $1000 donation. That letter was an official opinion letter from the office of the Johnson County Attorney. Bray stated he had been misled by the Plaintiff and that his informal opinion over the phone would have been different had he known the facts he now knew upon independent investigation. The letter then stated as follows:

First, you presented a fact situation which appeared to be a purchase of service agreement between you, Al Wickes, Jerry Smithey, and Johnson County. Al and Jerry are not really involved in the way you suggested. The funds for the group home are directly paid from the county and the group home is a county project, not a project from which they purchase service, as you suggested.

I suggested that you three individuals should incorporate yourselves, if in fact you were selling service to the county. I now understand you want to use this suggestion to establish a vehicle for accepting contributions which properly are county monies, but have the county continue to pay the cost of the group home. I did not advise such a scheme and I am hereby giving you my opinion that such a scheme can be considered a borderline misappropriation of county funds.

Bray sent copies of his letter to the Defendant, Judge Siebenmann, and Mr. Wickes. Bray had no other conversations with the Plaintiff between the time of her initial phone call regarding the donation, and the time of writing the letter in which he strongly questioned the honesty, integrity and character of the Plaintiff.

Bray delivered the letter to the Probation Office at a time when the Plaintiff was not there, so he returned later. He was angry, as was the Plaintiff after having read the letter, and they had an argument in the Probation Office.

That evening the Plaintiff left the Probation Office upset because she had been accused of being dishonest. At home that night she wrote a letter to Mr. Bray. The letter was written on personal stationery, on her own time. The return address on the letter was her home. The letter was hand-delivered to Bray's office. No copies were delivered to anyone else.

The letter from the Plaintiff to Bray, dated April 11, 1975, made a full explanation of the operation and bookkeeping of the Iowa City girls' group home. Then as a reaction to the challenge to her personal honesty, the Plaintiff included the following statements:

In defense of my integrity I wish to state that I am the only probation officer in Johnson County who has not ever translated other expenses into mileage to facilitate reimbursement through the Board of Supervisors. I have repeatedly refused to do so because I will not sign the statement on the back of the warrant unless my claim is entirely accurate. Not only have my mileage claims been consistently moderate, I have also not taken advantage of the option of claiming overtime income.

\*    \*    \*    \*    \*    \*

In my opinion your independent investigation was not adequate for the implications you raised in your letter of April 10, 1975. I can readily document my honesty and would expect the opportunity to do so.

Bray made the Plaintiff's April 11, 1975 letter available to Judge Siebenmann.

On April 18, 1975, Judge Siebenmann met with the Plaintiff in regard to the allegations she made in her April 11 letter. He instructed her to document the allegations concerning expense reimbursement for the other Probation Officers.

On April 25, 1975, Plaintiff Atcherson supplied the documentation requested by Judge Siebenmann. Her letter and attached documents showed the total mileage expenses claimed during the years 1968 to March 31, 1975, and cited specific examples throughout that period in regard to mileage

and expense vouchers allegedly improper. The report shows trips made to Marengo and separate vouchers filed for those trips on the same days that trips were made to cities beyond Marengo with other vouchers. Trips to Des Moines, Fort Dodge, Toledo, Eldora and Quakerdale would have taken the Probation Officer through the general area of Marengo. The Court notes that the long trips were generally followed by vouchers filed in Johnson County, while the trips to Marengo were filed in Iowa County. Other documentation concerned a trip to Chicago to return a juvenile which was made at the beginning of Wickes' vacation, affording Wickes reimbursement for the first miles of his vacation as he delivered the juvenile; an incident in which Jerry Smithey was to seek reimbursement under the name of mileage and travel expense for what was in fact group therapy sessions; and the choice of Wickes and Smithey, when they took time off during the week, to also take overtime payment rather than time off for overtime hours worked.

The documentation supplied by Plaintiff Atcherson was turned over to the County Attorney and the Defendant, Judge Siebenmann. The County Attorney, in turn, made the material available to a Johnson County Grand Jury.

On May 2, 1975, Judge Siebenmann again met with Esther Atcherson. The Judge was upset at the conduct of the Plaintiff in regard to the letter of April 11, 1975 to Daniel Bray. The Defendant told the Plaintiff he thought her actions had substantially harmed the working relationship in the Probation Office. He thought the letter to Bray was Probation Office business and therefore in violation of the directives of the August 15, 1974 memorandum on Probation Office policy that all interagency correspondence be approved by the Chief Probation Officer. The Defendant also cited two incidents which occurred prior to the August 15, 1974 memorandum, (1) the critical memo to the Department of Social Services, and (2) the deletion of psychological information in the report to the juvenile court. However the decision to sever the Plaintiff's connection with the Probation Office was based upon the letter she had written to Daniel Bray.[8]

During the May 2, 1975 meeting, Judge Siebenmann asked the Plaintiff if she would consider resignation. The Plaintiff was of the understanding that she had been told to resign by the person completely in control of her position with the Probation Office, since Judge Siebenmann had statutory authority over her employment. Judge Siebenmann viewed it more as a choice between resignation and waiting to see what he would do when he had fully

---

8. Judge Siebenmann testified as follows:

Q. —on May 2, 1975. But for the fact that Esther Atcherson had written that letter to Mr. Bray, would she have been terminated?
A. Well, I was certainly considering it. To me, it was a direct violation of this August 15th memorandum; and I don't think how it could have been made any clearer to the party. And inasmuch as things had improved, in my opinion, because of the lack of continuous complaints, because things smoothed out, because I think things worked a little better between the agencies, and we were making progress between them in regard to public relations between the parties, between the workers, I felt that she understood that memorandum. And I felt this was a direct violation of that directive.
Q. So that, in effect, she was terminated for the reason that she wrote the Bray letter in violation of the August 15, 1974 directive of yours?
A. Yes. In my opinion, she did. I think she did it hastily, but she did it.

* * * * * *

Q. Had she not written that letter to Mr. Bray, is it fair to say that your assessment was that her behavior had modified as a result of the August, 1974 memo to the point where it was your conclusion that things had smoothed over fairly well?
A. Well, of course, nothing ever happens perfectly; but I was getting less complaints from Mr. Wickes. I felt that, in itself, was an improvement. I was tired of getting confronted every time I went to Johnson County with the problem, the hands thrown up, "I can't do this", "I can't get that done", this type of thing. We had to have some resolution of that. I think that memorandum helped immensely. I understood that from that, and from the lack of complaints, that he was much happier over there with his deputy, and things were, perhaps, going a little more like a team of horses than a tug of war.
Q. And then came the Bray letter?
A. Yes.

decided. The nature of the meeting and the conversation, however, was that of a superior officer asking for a resignation.[9] Plaintiff was given 10 days to consider the matter. On May 5, 1975, the Plaintiff submitted a one-sentence letter of resignation, effective May 31, 1975.

Subsequent to the Plaintiff's departure from the Probation Office, the County Grand Jury reported it would issue no indictments on the basis of the information contained in the documentation the Plaintiff had supplied.

At the time she left the Probation Office, the Plaintiff was being paid a salary of $11,800.00. She was unemployed for approximately one year, during which time she was looking for employment but did not apply with the Department of Social Services or Job Service of Iowa, and did not take the Iowa Merit Employment examination. She became employed as a Veteran's Administration employee through the Department of Psychiatry as a research assistant with the University of Iowa Hospital, where her salary was $10,000.00.

## Issues Presented

1. Was the May 5, 1975 resignation of the Plaintiff voluntary or made under duress, the latter of which may be repudiated and may form the basis for this litigation?

2. If the resignation was forced and tantamount to a termination, were the grounds therefore legally permissible, in that the activities and conduct for which she was terminated are protected by the First Amendment to the United States Constitution?

3. If Plaintiff's termination was impermissible, to what damages, if any, is she entitled?

4. May the Defendant utilize absolute judicial immunity as a defense?

5. May the Defendant under the totality of the facts and circumstances, utilize a qualified immunity based upon the exercise of good faith, as a defense?

6. Was the responsive letter of April 11, 1975 from the Plaintiff to the opinion letter of Assistant County Attorney Bray within the categories of speech protected by the First Amendment to the United States Constitution? [10]

## Applicable Law

This cause of action arises under Title 42 U.S.C. § 1983 which states as follows:

Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation

9. Judge Siebenmann testified as follows:

Q. When I hear the word "option" used, I hear the word "choice." If she exercised her option not to resign, her choice would have been "wait around and be fired"; isn't that correct?
A. As I stated, that's pretty hard to say definitely. I never made that decision. I gave myself ten days to breathe to make a decision.
Q. Esther Atcherson didn't know that, did she?
A. I don't know whether she knew it or not. I made it pretty clear.
Q. She was called in front of the hire and fire authority for her job where there could be no appeal. There was no appeal. It's discretionary under the statute; isn't that correct?
A. I don't know if I terminated any officers in the whole district or whether she was the first one. I think she might have been the first in my sojourn there. I didn't go beyond the facts. I had a problem right in front of me.

Q. Under the statute, she was called in front of you as the one who had the future of her employment life in his hands; isn't that correct?
A. I suppose you would say that.
Q. You could have axed her right then?
A. Yes.
Q. And you gave her a choice to resign or "let me consider whether I am going to fire you or not"; isn't that the choice you gave her?
A. Right. I hadn't finally decided the latter.

10. The parties stipulated a further issue as to whether the actions of the Defendant amount to deprivation of rights which the Federal Courts will consider under *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). However, *Bishop* involves the deprivation of due process, whereas the instant case concerns First Amendment rights, and therefore is inapplicable.

of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Specifically, the Plaintiff asserts a violation of her constitutional rights pursuant to the First and Fourteenth Amendments to the United States Constitution, in the action of the Defendant taken pursuant to his authority as juvenile court judge under Section 231.8 Iowa Code (1975). Plaintiff claims Section 231.8 as applied in the circumstances of this case caused a deprivation of her constitutionally protected rights.

The discussion of the law of this case must be separated into the following general categories: (1) effect of resignation, (2) judicial and qualified immunity, (3) the First Amendment standard, and (3) remedies.

*1. Effect of resignation.*

■ Plaintiff Atcherson did submit a letter of resignation after the meeting with Judge Siebenmann. She would only be precluded from asserting this action, however, if that resignation were voluntary and not procured by duress or fraud. Annot., 132 A.L.R. 975 (1941); *see also Autera v. United States*, 389 F.2d 815, 816, 182 Ct.Cl. 495 (1968), at n. 2, *citing Dabney v. Freeman*, 123 U.S.App.D.C. 166, 167–68, 358 F.2d 533, 534–35 (1965); *Paroczay v. Hodges*, 111 U.S.App.D.C. 362, 364, 297 F.2d 439, 441 (1961), at n. 4. A resignation procured by duress or fraud is voidable and may be repudiated. 63 Am.Jur.2d *Officers* § 167 (1972).

*2. Judicial and qualified immunity.*

■ Judges have long enjoyed an absolute immunity from civil lawsuits arising from their judicial actions. *Bradley v. Fisher*, 13 Wall. 335, 347, 20 L.Ed. 646 (1872). Such absolute immunity, however, extends only to judicial actions and does not include activities ministerial in nature. [In adopting this Memorandum Opinion the District Court changed this sentence to read, "Such absolute immunity, however, extends only to judicial actions and does not include nonjudicial activities."]. *See Stump v. Sparkman*, 435 U.S. 349, 359, 98 S.Ct. 1099, 1106, 55 L.Ed.2d 331 (1978). *See also* 46 Am.Jur.2d *Judges* § 82 (1969) and 48 C.J.S. *Judges* § 65 (1947).[11]

■ The definition of a "judicial act" is elusive, particularly in regard to State judges with general jurisdiction. But in general terms the Court must look to the nature of the act itself to determine "whether it is a function normally performed by a judge, and to the expectations of the parties, i. e., whether they dealt with the judge in his judicial capacity." *Stump, supra* at 98 S.Ct. 1099, 1107. A relevant factor is the availability of an appellate review of the questioned act. "[J]udges should be at liberty to exercise their functions with independence and without fear of consequences . . . errors may be corrected on appeal but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption." *Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967).[12]

■ When performing ministerial [changed to "nonjudicial" by the District Court in adopting this Memorandum Opinion] functions a State judge may still enjoy a "qualified immunity" from civil action. The doctrine of a qualified immunity for officers of the State was fully established in *Scheuer v. Rhodes*, 416 U.S. 232, 238–48, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), although the issue was addressed earlier with regard to police officers in *Pierson v. Ray, supra*, 386 U.S. at 557, 87 S.Ct. 1213. Whereas *Scheuer* discussed top state officers, later cases have dealt with a qualified immunity for prison officials, *Procunier v. Navarette*, 434 U.S. 555, 562, 98 S.Ct. 855, 860, 54

---

11. *See Lynch v. Johnson*, 420 F.2d 818, 820 (6th Cir. 1970), involving a county judge who by statute also presides over a county fiscal commission.

12. *See* this Court's Order of July 10, 1978 denying the motion for summary judgment on the issue of immunity.

L.Ed.2d 24 (1978), state prosecutors, *Imbler v. Pachtman,* 424 U.S. 409, 427, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (continuing the common law absolute immunity), school board members, *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), and the superintendent of a state hospital, *O'Connor v. Donaldson,* 422 U.S. 563, 577, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).

■ The availability of qualified immunity under *Scheuer* is contingent upon a showing that the officer acted in good faith, and the court states as follows:

These considerations suggest that, in varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

*Scheuer,* 416 U.S. at 247–48, 94 S.Ct. at 1692. In the recent case of *Procunier v. Navarette, supra,* the court discusses a two-part standard for the application of qualified immunity which is extracted from *Wood v. Strickland, supra* : (1) The immunity defense would be unavailable if the constitutional right was clearly established, and (a) the defendant knew or should have known of that right and (b) the defendant knew or should have known his conduct violated that constitutional right. (2) The immunity defense would be unavailable where the official has acted with a malicious intention to deprive the individual of a constitutional right or to cause the individual other injury. *Procunier* at 98 S.Ct. 855, 860–62.

*3. The First Amendment standard.*

The exercise of First Amendment rights by a public employee must be reviewed through the application of a balancing test. In *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), Mr. Justice Marshall wrote as follows:

[I]t cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Pickering, supra* at 568, 88 S.Ct. at 1734. Under the guidelines of *Pickering,* the Court must consider two general factors: (1) the character of the speech involved, and (2) the potential of the speech for disrupting the employment relationship and efficient operation of the public service. *Haurilak v. Kelley,* 425 F.Supp. 626, 630 (D.Conn.1977). In *Haurilak,* Judge Lumbard, Circuit Judge, sitting by designation, has carefully outlined the specific factors within the above-stated general standard, as follows:

Factors under the first consideration include: whether the statements were defamatory or false, see, e. g., *Pickering v. Board of Education, supra,* 391 U.S. at 574, 88 S.Ct. 1731, 20 L.Ed.2d 811; *Fisher v. Walker,* 464 F.2d 1147, 1153–54 (10th Cir. 1972); *Magri v. Giarrusso,* 379 F.Supp. 353, 360–61 (E.D.La.1974); whether the statements concerned matters of public interest, see, e. g., *Pickering v. Board of Education, supra,* 391 U.S. at 573–74, 88 S.Ct. 1731; *Hanneman v. Breier,* 528 F.2d 750, 753 (7th Cir. 1976); and, whether the statements were made in a public or private forum, see, e. g., *Roseman v. Indiana University of Pennsylvania,* 520 F.2d 1364, 1368 (3rd Cir. 1975); *Sprague v. Fitzpatrick,* 412 F.Supp. 910, 917–20 (E.D.Pa.1976). Factors under the second consideration include: whether the statements were directed at an imme-

diate superior or an individual with whom the speaker had a close working relationship and, thus whether the statements might interfere with the maintenance of discipline and harmony among co-workers, see, e. g., *Pickering v. Board of Education*, supra, 391 U.S. at 569–70, 88 S.Ct. 1731; *Hanneman v. Breier*, supra, 528 F.2d at 753; and, whether the working relationship is of a type for which intimacy, or personal loyalty and confidence are essential, see, e. g., *Pickering v. Board of Education*, supra, 391 U.S. at 570 and 570 n. 3, 88 S.Ct. 1731; *Sprague v. Fitzpatrick*, supra, 412 F.Supp. at 919. See also *Magri v. Giarrusso*, supra, 379 F.Supp. at 360–61; *Tygrett v. Washington*, 346 F.Supp. 1247, 1251 (D.D.C.1972).

*Haurilak, supra* at 630–31.

■ The Plaintiff carries an initial burden to show that her conduct was (1) constitutionally protected and, (2) a "substantial factor" or "motivating factor" in her termination. *See Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Once the Plaintiff has made such a showing the burden shifts to the Defendant to demonstrate "that [he] would have reached the same decision as to [Plaintiff's employment] even in the absence of the protected conduct." *Mt. Healthy, supra.*

### 4. Remedies.

■ The language of Title 42 U.S.C. § 1983 that a person violating the statute "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress," establishes a form of tort liability. *Imbler v. Pachtman, supra*, 424 U.S. at 417, 96 S.Ct. 984. Thus, the Court may award damages, but those damages must be for actual loss. *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). An equitable decree may include an award of back pay. *Owen v. City of Independence, Missouri*, 560 F.2d 925, 931 (8th Cir. 1977). An award of punitive damages may be made when a defendant has demonstrated malice, or wilful or wanton misconduct. *Guzman v. Western*

*State Bank of Devils Lake*, 540 F.2d 948, 953 (8th Cir. 1976).

■ A plaintiff claiming she was discharged in violation of her constitutionally protected rights cannot remain idle, claiming lost wages by way of damages from the date of the discharge, but must make a reasonable effort to mitigate her damages by accepting alternative employment. *O'Neal v. Gresham*, 519 F.2d 803, 805 (4th Cir. 1975); *see also* Annot. 44 A.L.R.3d 629 (1972). The plaintiff does not need to accept employment of a significantly different kind. Annot. 44 A.L.R.3d at 640.

■ A common remedy for the impermissible discharge of an employee for the protected exercise of First Amendment rights is reinstatement. *Ayers v. Western Line Consol. Sch. Dist.*, 555 F.2d 1309, 1321 (5th Cir. 1977); *Decker v. North Idaho College*, 552 F.2d 872, 874 (9th Cir. 1977); *Abbott v. Thetford*, 529 F.2d 695, 701 (5th Cir. 1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 804 (1976). Reinstatement has been identified as "a necessary element of an appropriate remedy in wrongful employee discharge cases." *Abbott v. Thetford, supra.* As an equitable remedy, however, reinstatement may be inappropriate where the plaintiff has unclean hands. *Ayers v. Western Line Consol. Sch. Dist., supra* at 1321–22; *Skehan v. Bd. of Trustees of Bloomburg State*, 436 F.Supp. 657, 664 (M.D.Pa.1977). The creation of antagonism and ill feelings, without some behavior by the plaintiff that arises to the level of unclean hands, will not serve as an obstacle to reinstatement. *Abbott, supra; Sterzing v. Fort Bend Ind. Sch. Dist., Fort Bend, Texas*, 496 F.2d 92, 93 (5th Cir. 1974).

■ In a civil action for violation of First Amendment rights, pursuant to 42 U.S.C. § 1983, the Court may, in its discretion, allow a reasonable attorney's fee to the prevailing party as part of the costs. 42 U.S.C. § 1988; *International Society for Krishna Consc., Inc. v. Andersen*, 569 F.2d 1027, 1028–29 (8th Cir. 1978). It is no longer necessary to find a State official acted in bad faith in his official capacity in order to

allow attorney's fees. *Pickett v. Milam,* 579 F.2d 1118 at 1120 (8th Cir. 1978). Although this action was filed on May 6, 1976, and the Act making attorney's fees available was enacted on October 19, 1976, the Act was intended to be applicable to all cases pending and future at the time of its enactment. *Wharton v. Knefel,* 562 F.2d 550, 557 (8th Cir. 1977).

■ The amount of attorney's fees should "be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases and not be reduced because the rights involved may be nonpecuniary in nature." Senate Rep.No.94–1011, 94th Cong., 2d Sess. 6, *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 5908, 5913. The Court may consider the complexity of the case, quality of the legal services rendered by counsel, time and effort expended on the case by counsel, and the beneficial result. *Schmidt v. Schubert,* 433 F.Supp. 1115, 1118 (E.D.Wis.1977). The Court must set the amount of attorney's fees with an awareness that the very purpose of awarding attorney's fees in such an action is to facilitate private enforcement of the rights. The amount of the award must not discourage attorneys from accepting and diligently pursuing such lawsuits. *Com. of Pennsylvania v. O'Neill,* 431 F.Supp. 700, 708 (E.D. Pa.1977).

### Conclusion

■ Plaintiff Esther Atcherson's employment with the Johnson County Probation Office was terminated by the Defendant, Judge John Siebenmann. The circumstances of the May 2, 1975 meeting between the Plaintiff and the Defendant can only be interpreted as a request for a resignation after the Defendant had determined the Plaintiff should be severed from the Probation Office. The only choice presented to the Plaintiff on that occasion was an opportunity to protect her personal reputation by resigning, or to be fired. The Plaintiff may repudiate such a resignation.

■ Judge Siebenmann would be immune from an action such as the instant case had the matter in question been a judicial act. However, the actions taken herein were the actions of an administrator, not a judge. The parties did not deal with the Judge in a judicial capacity. He was, instead, their ultimate superior in the operation of the Probation Office. This is not a function performed by a judge, but is a function of a departmental supervisor, and as such is a ministerial duty. The decision in this instance was not subject to a judicial appeal, and does not constitute the kind of decision-making power that courts have sought to protect with an absolute immunity.

■ Acting as an administrator, the Defendant might have been protected by a qualified immunity. However, when a person is deprived of a constitutional right, qualified immunity is dependent upon a showing of good faith. Judge Siebenmann certainly acted with no malice toward the Plaintiff's civil rights. But her rights under the First Amendment were clearly established, and Judge Siebenmann knew or should have known of those rights, and that his conduct was a violation of the freedom.

Judge Siebenmann placed undue reliance upon Mr. Wickes, who is found by this Court to be unworthy of that trust. The bad faith of Mr. Wickes could have been avoided by the Defendant had the Judge taken it upon himself to make an independent investigation at some point. Recognizing his heavy judicial workload, this Court is sympathetic to the Defendant's argument that he did not have time to spend with personnel matters in the Probation Office; but that was his responsibility. His failure to take action to demonstrate to himself the truth of the allegations by Mr. Wickes must be considered in determining the lack of good faith. The defense of qualified immunity is not available to the Defendant under the circumstances of this case.

The Plaintiff's letter of April 11, 1975 to Daniel Bray was a personal reaction to an attack on her honesty and integrity. The Court has no difficulty whatever understanding why the Plaintiff would have been

disturbed with the April 10, 1975 letter. from Mr. Bray. To deprive a citizen of the right to answer such a careless accusation would be unfair, and is prohibited by the First Amendment.

While fully cognizant of the need to balance the First Amendment rights of public employees with the need for efficiency and proper operation of public services, the Court cannot, within the confines of this case, place any limitation on the kind of speech embodied in the letter to Bray. The information contained in the letter was certainly damaging to the reputations of the other Probation Officers and the Probation Office itself. But the failure of the County Grand Jury to indict upon that information cannot be read by this Court as a determination that the information is false. The public has a substantial interest in knowing of flaws in the operation of public services. And, the Court is reviewing a personal letter, not a letter to the editor, a television interview, or the like. By using a private forum, the Plaintiff did nothing to cause damage in the public view.

In an office the size of the Johnson County Probation Office, there is little doubt that such a communication as the April 11, 1975 letter to Mr. Bray would "interfere with the maintenance of discipline and harmony among co-workers." *Pickering, supra,* 391 U.S. at 569–70, 88 S.Ct. at 1735. Yet the record shows that Plaintiff performed her job as a Probation Officer very well despite disharmony in the office. This is because the office was run in a fashion that left each officer to deal with their juveniles under supervision. The Court cannot find that the letter to Mr. Bray would have greatly increased the disharmony that was already present. Further, should the allegations in the letter be true, the creation of disharmony cannot be so feared as to silence the critic who would inform the public of this misbehavior by public officials.

Judge Siebenmann's straight-forward testimony has convinced the Court that the letter to Mr. Bray was a "substantial factor" or "motivating factor" in the termination of the Plaintiff. Although other matters were cited as reasons for the termination, the Plaintiff would not have been asked to resign had she not written the letter. She was terminated on the basis of her exercise of a protected right, and, under the balancing test enunciated in *Pickering, supra,* the termination was impermissible.

■ Remedies for such a deprivation of First Amendment freedom must include reinstatement. When the termination of employment was unlawful, the relief must correct the previous error by overturning the unlawful termination of employment. The Court is not insensitive to the ill feelings reinstatement must surely cause in a small office such as the Johnson County Probation Office, but the Court is guided by Judge Brown in *Abbott v. Thetford, supra* at 701, wherein he writes as follows:

> While we share the concern . . . that reinstatement might revive old antagonisms, every case of reinstatement raises the possibility of ill feelings. "Relief is not restricted to that which will be pleasing and free of irritation." (citation omitted)

Plaintiff Atcherson testified at trial that she wanted her job back, "in some ways." She has obtained other employment. At this point she may wish to voluntarily resign. To do so would not deprive her of any other relief ordered herein.

■ An award of back pay to the Plaintiff must be made in light of the time she remained unemployed. The Court recognizes the job market is restricted and that the Plaintiff only had to accept work of a reasonably similar nature, but the record does not offer an explanation for a full year's unemployment. Plaintiff has not made a reasonable effort to mitigate her damages, and cannot receive back pay for the entire year of her unemployment. The Court finds the Plaintiff entitled to back pay for six months of the year during which she was unemployed, in the amount of $5,900.00, and the difference between her current salary and her salary at the time of her termination, for two years, in the amount of $3,600.00. Total damages awarded for back pay will be $9,500.00.

After careful consideration of the evidence and the applicable law, the Court makes the following specific findings:

1. The May 5, 1975 resignation letter of the Plaintiff was not a voluntary resignation, and may be repudiated.

2. The April 11, 1975 letter to Mr. Bray was a motivating factor in the termination of the Plaintiff.

3. The termination of Esther Atcherson as a Probation Officer in Johnson County as a result of the April 11, 1975 letter to Mr. Bray was legally impermissible in that the activities and conduct for which she was terminated, when evaluated pursuant to the balancing test, are protected by the First Amendment to the United States Constitution.

4. The termination of the Plaintiff was an administrative action, not judicial, and therefore the doctrine of absolute immunity is not available to the Defendant, Judge John Siebenmann.

5. The doctrine of qualified immunity is not available to the Defendant, Judge John Siebenmann, because his termination of the Plaintiff was caused by her exercise of a clearly established constitutional right; the Defendant knew of that right and should have known that his termination action violated that right.

6. Plaintiff, Esther Atcherson, should be reinstated to her position as Deputy Probation Officer in Johnson County, with back pay and full salary, seniority, and any accruing benefits, raises and increments.

7. Plaintiff, Esther Atcherson, is entitled to an award of reasonable attorney's fees and the costs of this action.

Accordingly,

IT IS ORDERED that the Clerk of the Court enter a judgment against the Defendant and in favor of the Plaintiff in the amount of $9,500.00 constituting back pay.

IT IS FURTHER ORDERED that the Plaintiff, Esther Atcherson, be immediately reinstated as Deputy Probation Officer for Johnson County with full salary, seniority, and any accruing benefits, raises and increments.

IT IS FURTHER ORDERED that the Defendant, Judge John Siebenmann, be assessed for the reasonable attorney's fees of the Plaintiff, and the costs of this litigation.

IT IS FURTHER ORDERED that counsel for the Plaintiff file an affidavit on or before September 15th, 1978 itemizing time spent in the preparation and presentation of this lawsuit. A specific amount of attorney's fees will be awarded within a reasonable time after the Court receives said affidavit.