Esther ATCHERSON, Appellee,

v.

Honorable Judge John SIEBENMANN, Judge of the Juvenile Court, Johnson County, District Court of Iowa, Appellant.

Esther ATCHERSON, Appellant,

v.

Honorable Judge John SIEBENMANN, Judge of the Juvenile Court, Johnson County, District Court of Iowa, Appellee.

Nos. 78–1819, 79–1109.

United States Court of Appeals, Eighth Circuit.

Submitted March 15, 1979.

Decided Sept. 13, 1979.

Rehearing Denied Oct. 23, 1979.

Stephen C. Robinson, Asst. Atty. Gen., Des Moines, Iowa, for Siebenmann; Thomas J. Miller, Atty. Gen. of Iowa, on brief.

E. Eugene Davis, Des Moines, Iowa, for amicus, Iowa Judges Ass'n; Paul E. Horvath and George W. Murray, Des Moines, Iowa, on brief.

Gordon E. Allen, Legal Director, Iowa Civil Liberties Union, Des Moines, Iowa, for Atcherson; Mark W. Bennett, Staff Atty., Des Moines, Iowa, on brief.

Before BRIGHT and STEPHENSON, Circuit Judges, and LARSON, District Judge.*

BRIGHT, Circuit Judge.

Appellee Esther Atcherson brought this action under 42 U.S.C. § 1983 (1976), against appellant, Honorable John Siebenmann, Judge of the Juvenile Court, Johnson County, District of Iowa, alleging that

* EARL R. LARSON, United States Senior District Judge, District of Minnesota, sitting by designation.

Judge Siebenmann unlawfully terminated her employment as a county juvenile probation officer in derogation of her first amendment rights. A United States Magistrate tried the action and made findings and conclusions adverse to Judge Siebenmann. The district court in essence adopted those findings and conclusions and entered a judgment awarding reinstatement, $9,500 backpay, costs and attorney's fees to Atcherson.[1]

On appeal Judge Siebenmann makes the following contentions:

1) the district court's finding that Judge Siebenmann coerced Atcherson's resignation is erroneous;

2) the court erred in concluding that Atcherson's letter of April 11, 1975, which contained allegations of misconduct by fellow probation officers but also arguably violated office guidelines, falls within the protection of the first amendment;

3) the district court erred in determining that Atcherson's first amendment conduct (the letter) was a substantial or motivating factor in Judge Siebenmann's decision to terminate her employment;

4) Judge Siebenmann's actions were (a) cloaked in absolute judicial immunity, or (b) performed in good faith and therefore protected by the doctrine of qualified immunity; and

5) the district court awarded excessive damages.

Upon a careful review of the record, we conclude that the district court improperly rejected Judge Siebenmann's qualified immunity defense. Accordingly, we reverse the backpay award, vacate the reinstatement order, and remand.

I. *Background.*

The district court opinion, reported at 458 F.Supp. 526 (S.D.Iowa 1978), fully recites the underlying facts. We summarize those facts bearing on appellant's claim of infringement of first amendment rights and on Judge Siebenmann's qualified immunity defense.

During the events in question, Judge Siebenmann served as juvenile court judge for an area in Iowa including Johnson County. In that position, Judge Siebenmann possessed administrative authority over the operation of the Johnson County Juvenile Probation Office (the probation office), including authority to hire and fire probation officers "at [his] pleasure." Iowa Code Ann. § 231.8 (1969).[2]

At all material times until her resignation effective May 31, 1975, Esther Atcherson served as one of three juvenile probation officers in the probation office. Chief Probation Officer H. A. Wickes supervised the activities of Atcherson and her co-deputy probation officer, Jerry Smithey. The probation office operated on an informal basis, and each probation officer possessed a high degree of autonomy in his or her work.

By early 1975, relations between Atcherson and her supervisor, Wickes, had been strained for some time.[3] Wickes met with Judge Siebenmann on a regular basis and often complained to the judge of difficulties in dealing with Atcherson. Some of Wickes' charges were inaccurate or exaggerated. However, because of his busy schedule, Judge Siebenmann relied entirely upon Wickes regarding probation office affairs, and Wickes' complaints represented his primary source of information concerning

---

1. The district court decision, adopting the magistrate's opinion with minor modifications, is reported as *Atcherson v. Siebenmann*, 458 F.Supp. 526 (S.D.Iowa 1978).

2. The Iowa legislature subsequently amended section 231.8 to place administrative responsibility for the probation office in the hands of a "probation officer committee" composed of judicial officers. *See* Iowa Code Ann. § 231.8 (Supp.1979). That change in state law does not affect the issues before us.

3. The district court found that this tension arose both from Atcherson's "aggressiveness," which "although often well-intentioned and on behalf of juveniles under her supervision, created conflict," and from "Mr. Wickes' weaknesses as an administrator and supervisor." *Atcherson v. Siebenmann, supra,* 458 F.Supp. at 529.

Atcherson's performance. Despite the disharmony between Wickes and Atcherson, the probation office functioned reasonably smoothly due to the officers' independence in their work.

In the course of her employment, Atcherson assumed certain responsibilities for the operation of a "girls' group home," an emergency shelter facility in Iowa City. Her duties included the maintenance of records and bookkeeping for the group home's general expenses funded by Johnson County.

In late March of 1975, Atcherson received a $1,000 contribution to the girls' home from a nonprofit corporation that previously had operated a halfway house on the premises taken over by the group home. Atcherson wanted to apply the contribution to special needs of the girls not allowed under the warrant from Johnson County, and she telephoned Assistant County Attorney Daniel Bray, seeking advice as to how the group home could accept those funds without turning them over to the county. Bray, unfamiliar with the status of the group home, interpreted Atcherson's sketchy explanation of the home as indicating a project privately operated by the probation officers under a contract with the county. His initial, tentative advice to Atcherson rested upon that misapprehension. Upon learning of the actual status of the group home, Bray, in April 10, 1975, wrote Ms. Atcherson a critical letter suggesting that Atcherson had misrepresented the facts and that her suggested "scheme" could be considered a "borderline misappropriation of county funds."

Atcherson wrote and hand-delivered to Bray a personal letter, dated April 11, 1975, fully explaining the bookkeeping and operation of the girls' group home and, in reaction to Bray's accusations, adding the following:

> In defense of my integrity I wish to state that I am the only probation officer in Johnson County who has not ever translated other expenses into mileage to facilitate reimbursement through the Board of Supervisors. I have repeatedly refused to do so because I will not sign the statement on the back of the warrant unless my claim is entirely accurate. Not only have my mileage claims been consistently moderate, I have also not taken advantage of the option of claiming overtime income.

> \*   \*   \*   \*   \*   \*

> In my opinion your independent investigation was not adequate for the implications you raised in your letter of April 10, 1975. I can readily document my honesty and would expect the opportunity to do so. [458 F.Supp. at 532.]

Bray gave Judge Siebenmann a copy of Atcherson's letter.

On April 18, 1975, Judge Siebenmann met with Atcherson and instructed her to document the allegations in her letter concerning improper expense reimbursements of the other probation officers. Atcherson furnished such documentation, which circumstantially supported her charges, on April 25, 1975.

After receiving the documentation of the alleged false expense claims, Judge Siebenmann conferred with his three probation officers. He testified at trial concerning this conference:

> I told them what I was planning to do, what I thought this thing meant; and it was serious and that it involved the reputation of the entire group of the probation officers as well as the juvenile court; and for all I know, it had in roads [sic] into the courthouse, auditor's office, and other problems; and that I was going to give it to the County Attorney to do with as he saw fit, which I did.

Judge Siebenmann thereafter turned Atcherson's documentation over to the County Attorney who, in turn, presented it as well as other evidence on the subject to a Johnson County grand jury.

On May 2, 1975, Judge Siebenmann again met with Atcherson. He told her that he considered her allegations probation office business and that her letter of April 11 had directly violated his August 15, 1974 directive to probation officers, requiring that

all interagency correspondence be channelled through Chief Probation Officer Wickes. Judge Siebenmann also told Atcherson that her conduct had substantially harmed the working relationships in the probation office. He testified at trial:

> I said frankly * * * that having accused her two associate probation officers of fraud and cheat and deceit in mileage records, and their being knowledgeable of it, I felt it was—I thought it would be pretty difficult for that office to continue in the way it had up, at least, to that point. I frankly felt the whole office had had a whole set back at that point.

At the conclusion of the May 2 meeting, Judge Siebenmann stated to Atcherson that he would give her ten days to consider resignation and that he then would have to decide whether she could remain as a probation officer.[4] On May 5, Atcherson submitted her resignation, effective May 31, 1975.

Judge Siebenmann testified at trial that he reserved judgment concerning whether or not to discharge Wickes pending completion of the grand jury investigation of the false expense claim allegations. The grand jury ultimately declined to return an indictment, and Wickes has retained his position as chief probation officer.

The district court, in entering judgment for Atcherson, approved the following conclusions of the magistrate:

1) Atcherson's resignation was not voluntary;

2) Judge Siebenmann caused Atcherson's resignation in retaliation for her letter to Assistant County Attorney Bray;

3) That letter constitutes conduct protected by the first and fourteenth amendments;

4) Judge Siebenmann in terminating Atcherson acted as an administrator, not in a judicial capacity, and therefore was not entitled to absolute judicial immunity;

5) Judge Siebenmann knew of Atcherson's first amendment rights and should have known that his conduct violated those rights, and he therefore failed to establish a qualified immunity defense; and

6) Atcherson is entitled to backpay, attorney's fees, and reinstatement.

## II. The Alleged First Amendment Violation.

■ Initially, we reject Judge Siebenmann's attack on the district court findings that Atcherson resigned under duress and that the April 11 letter to Bray motivated Judge Siebenmann's pressure upon Atcherson to resign. Those factual findings are not clearly erroneous. See Fed.R.Civ.P. 52(a).

■ Judge Siebenmann contends, nonetheless, that Atcherson's letter does not fall within the category of speech protected by the first amendment, because the letter was sent to Bray in violation of a probation office policy requiring that all interagency correspondence be reviewed by Wickes, and because it contained allegations that might interfere with the maintenance of "discipline by immediate superiors or harmony among coworkers." *Pickering v. Board of Education*, 391 U.S. 563, 570, 88 S.Ct. 1731, 1735, 20 L.Ed.2d 811 (1968). *See Sprague v. Fitzpatrick*, 546 F.2d 560 (3d Cir. 1976), *cert. denied*, 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977); *Abbott v. Thetford*, 534 F.2d 1101 (5th Cir. 1976) (*en banc*), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 804 (1977); *Roseman v. Indiana University of Pennsylvania*, 520 F.2d 1364 (3d Cir. 1975), *cert. denied*, 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976). Upon a

---

4. The district court made the following findings concerning this "option" to resign:

> [Atcherson] was of the understanding that she had been told to resign by the person completely in control of her position with the Probation Office, since Judge Siebenmann had statutory authority over her employment. Judge Siebenmann viewed it more as a choice between resignation and waiting to see what he would do when he had fully decided. The nature of the meeting and the conversation, however, was that of a superior officer asking for a resignation. [*Atcherson v. Siebenmann, supra*, 458 F.Supp. at 533–34 (footnote omitted).]

careful examination of the record, we conclude that the district court properly rejected that contention of the appellant.

█ Under the guidelines enunciated in *Pickering v. Board of Education, supra,* first amendment protection of a public employee's speech depends upon a balancing of the employee's interest as a citizen in commenting on the matter at issue against the interests of the employing governmental entity in the efficient operation of public services. *See Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979).

█ Here, the accusations in Atcherson's letter, to the extent Atcherson's coworkers became aware of them, would naturally tend to disrupt working relationships among the probation office staff. When he suggested Atcherson's resignation, Judge Siebenmann properly expressed concern about such disruption.[5] In light of the circumstances disclosed at trial, however, the district court found that Atcherson's allegations would not have greatly increased the disharmony already present in the probation office and that, because of the officers' independence in their work, the probation office could operate satisfactorily despite such disharmony. Those findings are not clearly erroneous.[6]

█ More importantly, Atcherson's allegations of misappropriation of public funds by her coworkers represent a matter of compelling public concern.[7] Apart from the

other members of the probation office staff, Atcherson may have been the only person aware of the evidence that her coemployees padded their mileage claims. In these circumstances, a public employee's right to speak out on such an important matter must be protected from the threat of retaliatory discharge. *Cf. Pickering v. Board of Education, supra,* 391 U.S. at 571–72, 88 S.Ct. 1731 (teachers, likely to be best-informed citizens on questions of use of school funds, must be able to speak out freely on such questions without fear of retaliation). As the district court stated, "the creation of disharmony cannot be so feared as to silence the critic who would inform the public of this misbehavior by public officials." *Atcherson v. Siebenmann, supra,* 458 F.Supp. at 539.

In sum, we hold that the trial court did not err in ruling that the termination of Atcherson's employment violated her rights under the first and fourteenth amendments.

### III. *The Qualified Immunity Defense.*

Judge Siebenmann contends that, even if it appears in retrospect that he violated Atcherson's constitutional rights, he is entitled to immunity from liability, because he acted reasonably and in good faith in light of "the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based." *Scheuer v. Rhodes,* 416 U.S. 232, 247, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974).

The district court rejected that defense and reasoned as follows:

> her suspicion of Wickes' and Smithey's mileage claims. However, we cannot say that Assistant County Attorney Bray was an improper recipient of such information. Additionally, Atcherson's use of a private letter ordinarily would cause less disruption than making such charges publicly.

---

**5.** Judge Siebenmann's additional reason for requesting Atcherson's resignation, that she had violated an office rule by delivering her April 11 letter regarding probation office business to Bray without review of the letter by Wickes, cannot be sustained. The enforcement of such a rule against an employee seeking to criticize the very superior empowered to review office correspondence would impermissibly chill first amendment rights.

**6.** The manner, time and place of a private communication may serve as factors in the "*Pickering* calculus" concerning first amendment protection of that communication. *Givhan v. Western Line Consolidated School District, supra,* 439 U.S. at 415, 99 S.Ct. at 696 n.4. Here, Atcherson might most appropriately have advised Judge Siebenmann, rather than Bray, of

**7.** The grand jury's failure to return indictments on the basis of the information supplied by Atcherson does not amount to a determination that Atcherson's allegations against Wickes and Smithey were false or scurrilous. To the contrary, the record discloses that Atcherson in good faith believed her accusations to be true and, in addition, possessed a reasonable factual basis for such belief.

Acting as an administrator, the Defendant might have been protected by a qualified immunity. However, when a person is deprived of a constitutional right, qualified immunity is dependent upon a showing of good faith. Judge Siebenmann certainly acted with no malice toward the Plaintiff's civil rights. But her rights under the First Amendment were clearly established, and Judge Siebenmann knew or should have known of those rights, and that his conduct was a violation of the freedom.

Judge Siebenmann placed undue reliance upon Mr. Wickes, who is found by this Court to be unworthy of that trust. The bad faith of Mr. Wickes could have been avoided by the Defendant had the Judge taken it upon himself to make an independent investigation at some point. Recognizing his heavy judicial workload, this Court is sympathetic to the Defendant's argument that he did not have time to spend with personnel matters in the Probation Office; but that was his responsibility. His failure to take action to demonstrate to himself the truth of the allegations by Mr. Wickes must be considered in determining the lack of good faith. The defense of qualified immunity is not available to the Defendant under the circumstances of this case. [*Atcherson v. Siebenmann, supra,* 458 F.Supp. at 538.]

We disagree. Assuming without deciding that Judge Siebenmann acted as an administrator and not in his judicial capacity, we hold that he established a qualified immunity defense to damages liability.[8]

■ The courts long have recognized a limited immunity from personal liability for unconstitutional conduct, applicable to many classes of public officials who are required to exercise discretion in the course of their responsibilities. Such immunity is necessary because

[t]he imposition of monetary costs for mistakes which were not unreasonable in the light of all the circumstances would undoubtedly deter even the most conscientious [governmental] decisionmaker from exercising his judgment independently, forcefully, and in a manner best serving the long-term interest of the [public]." [*Wood v. Strickland,* 420 U.S. 308, 319–20, 95 S.Ct. 992, 999–1000, 43 L.Ed.2d 214 (1975) (school board members).]

*See, e. g., Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (federal executive officials); *Scheuer v. Rhodes,* 416 U.S. 232, 241–42, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (state executive officers).

The Court in *Scheuer v. Rhodes, supra,* generally described the qualified immunity standard applicable in this case:

It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive

---

**8.** Because of our disposition of the qualified immunity issue, we do not reach Judge Siebenmann's argument that his conduct in terminating Atcherson's employment was cloaked in absolute judicial immunity.

In addition, we confine our analysis of the qualified immunity defense to the issues of Judge Siebenmann's personal liability for damages clearly presented on this appeal, although the district court's reinstatement order eventually *may* require further analysis of the immunity problem. *Cf. Monell v. Department of Social Services,* 436 U.S. 658, 701, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

At oral argument before this court, Atcherson's counsel asserted that the reinstatement order may apply both to Judge Siebenmann personally and to his official capacity at the

time of suit, as Juvenile Court Judge and administrator of the Johnson County Probation Office. We interpret the monetary judgment as against Judge Siebenmann individually, but the reinstatement order does not specify to whom it is directed. We hesitate to assume that the reinstatement order applies only to the defendant personally, for Judge Siebenmann was transferred to another judicial capacity and no longer possessed authority to reemploy Atcherson at the time the order was entered. *See Atcherson v. Siebenmann, supra,* 458 F.Supp. at 529. On the other hand, the record does not unambiguously indicate that Atcherson sued Judge Siebenmann in his official capacity. The district court must resolve this uncertainty on remand.

officers for acts performed in the course of official conduct. Mr. Justice Holmes spoke of this, stating:

"No doubt there are cases where the expert on the spot may be called upon to justify his conduct later in court, notwithstanding the fact that he had sole command at the time and acted to the best of his knowledge. That is the position of the captain of a ship. But even in that case great weight is given to his determination and the matter is to be judged on the facts as they appeared then and not merely in the light of the event." *Moyer v. Peabody*, 212 U.S. 78, 85, 29 S.Ct. 235, 237, 53 L.Ed. 410 (1909). (Citations omitted.)

[*Scheuer v. Rhodes, supra*, 416 U.S. at 247–48, 94 S.Ct. at 1692.]

In *Wood v. Strickland, supra*, in the context of an action against school board members, the Court explained that this qualified immunity standard contains two elements: an "objective" test of the official action's reasonableness in light of the circumstances known at the time; and a "subjective" test of good faith. The Court stated:

Therefore, in the specific context of school discipline, we hold that a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student. That is not to say that school board members are "charged with predicting the future course of constitutional law." *Pierson v. Ray*, 386 U.S. [547], at 557, 87 S.Ct. [1213], at 1219 [18 L.Ed.2d 288]. A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith. [*Wood v. Strickland, supra*, 420 U.S. at 322, 95 S.Ct. at 1001.]

Here, the subjective good faith test plainly is satisfied. The record thoroughly supports the district court's finding that Judge Siebenmann acted without malice towards Atcherson's constitutional rights.

The remaining question is whether, at the time of the events giving rise to this action, Judge Siebenmann knew or should have known that his actions would violate Atcherson's "clearly established" constitutional rights. That question must be answered negatively.

While we hold *infra* that Atcherson's allegations of misconduct by her fellow probation officers qualify for constitutional protection, that conclusion was by no means "clearly established" at the time of the events in question. In *Pickering v. Board of Education, supra*, 391 U.S. at 570 n.3, 88 S.Ct. 1731, the Court expressly left open the possibility that even completely correct public criticism of coworkers or superiors might furnish a permissible basis for dismissal of a public employee, if such criticism is sufficiently destructive of an effective working relationship between the critic and his coemployees. Since then, several courts have relied upon the potentially disruptive impact of employee criticism in denying first amendment protection to public employees discharged for speech. *See Sprague v. Fitzpatrick*, 546 F.2d 560 (3d Cir. 1976), *cert. denied*, 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977); *Abbott v. Thetford*, 534 F.2d 1101 (5th Cir. 1976) (*en banc*), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1598, 1 L.Ed.2d 804 (1977); *Roseman v. Indiana University of Pennsylvania*, 520 F.2d 1364 (3d Cir. 1975), *cert. denied*, 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976). We do not consider those cases as controlling on the first amendment issue presented here. However, those decisions convincingly illustrate that, in May 1975, Judge Siebenmann might reasonably have believed that Atcherson's accusations of misconduct against her coemployees, if likely to cause serious disharmony in the probation office, were not subject to constitutional protection.

The findings of the district court, supported by the record, establish that Judge Siebenmann in good faith believed, at the time of his May 2, 1975 meeting with Atcherson, that the letter to Bray represented the culmination of a long series of insubordinate and disruptive acts by Atcherson. In forming that belief, Judge Siebenmann relied upon the numerous prior complaints of Chief Probation Officer Wickes concerning Atcherson's conduct. On that basis, the defendant concluded that the probation office could not continue to operate effectively with its existing personnel. Accordingly, he suggested that Atcherson resign, with the understanding that otherwise he would have to decide whether or not to discharge her. He did not, however, ignore Atcherson's allegations of misconduct. Rather, he appropriately turned the information supplied by Atcherson over to the County Attorney's Office for investigation and reserved decision on Wickes' continued employment pending the outcome of that investigation.

The district court, in evaluating the reasonableness of these actions of the defendant, focused upon Judge Siebenmann's reliance on Wickes' sometimes inaccurate representations and his failure to undertake an independent investigation of the degree of Atcherson's responsibility for the disharmony in the probation office.[9]

■ In our judgment, that focus of the district court discloses a misconception of qualified immunity principles. First, the trial court evaluated the defendant's actions with the benefit of hindsight—because the court found after a plenary trial that Wickes was unreliable, it reasoned that Judge

Siebenmann also ought to have been wary of placing confidence in his chief subordinate. Second, the court imposed a duty of independent investigation upon Judge Siebenmann and found that he breached such a duty because the sources on which he relied later proved to be inaccurate. The standard for qualified immunity, however, requires only "reasonable grounds for the belief formed at the time and in light of all the circumstances [known to the actor]," *Scheuer v. Rhodes, supra,* 416 U.S. at 247–48, 94 S.Ct. at 1692, and permits reliance upon "traditional sources for the factual information," *id.* at 246, 94 S.Ct. at 1691. *See Wood v. Strickland, supra,* 420 U.S. at 319, 95 S.Ct. 992.

We think that, in assessing the impact of Atcherson's letter upon the probation office, Judge Siebenmann was entitled to rely, at least as an initial matter, upon the information concerning Atcherson's conduct provided over a long period by Wickes.[10] Whether or not he displayed good character judgment in doing so, Judge Siebenmann had delegated day-to-day supervisory authority over the probation office to Wickes. The reports of such a delegate certainly represent a "traditional source" of information concerning matters within his authority. Thus, on the basis of the circumstances as he knew or should have known them to be on May 2, 1975, Judge Siebenmann might reasonably have concluded that, by her impulsive letter to Bray, Atcherson had demonstrated such a recurring tendency to disrupt probation office operations that her discharge might be justified regardless of the truth of her accusations against Wickes and Smithey.

9. As already noted, the district court stated:
   Judge Siebenmann placed undue reliance upon Mr. Wickes, who is found by this Court to be unworthy of that trust. The bad faith of Mr. Wickes could have been avoided * * * had the Judge taken it upon himself to make an independent investigation at some point. * * * His failure to take action to demonstrate to himself the truth of the allegations by Mr. Wickes must be considered in determining the lack of good faith. The defense of qualified immunity is not available to the Defendant under the circumstances of this

case. [*Atcherson v. Siebenmann, supra,* 458 F.Supp. at 538.]

10. Although the district court properly ruled that pressure from Judge Siebenmann caused Atcherson's resignation, the record establishes that the defendant never reached the point of deciding to discharge Atcherson. Thus, we need not consider whether Judge Siebenmann reasonably could have relied upon Wickes' representations, without further investigation, if Atcherson had refused to resign within the 10-day grace period offered to her.

In sum, the evidence indicates that Judge Siebenmann made an error in judgment in requesting Ms. Atcherson's resignation. However, because he acted in good faith that error does not subject him to financial liability. As the Supreme Court stated in *Scheuer v. Rhodes*:

Implicit in the idea that officials have some immunity—absolute or qualified—for their acts, is a recognition that they may err. The concept of immunity assumes this and goes on to assume that it is better to risk some error and possible injury from such error than not to decide or act at all. [416 U.S. at 242, 94 S.Ct. at 1689.]

Accordingly, we vacate the judgment to the extent that it requires Judge Siebenmann personally to pay money damages and attorney's fees, and we remand for further proceedings concerning the reinstatement order. *See* note 8 *supra.*

Reversed in part and remanded to the district court.[11] No costs are awarded on appeal.

LARSON, Senior District Judge, dissenting.

I respectfully dissent.

I would affirm the district court's finding that Judge Siebenmann was acting in an administrative or non-judicial capacity and therefore was not protected by an absolute immunity. Furthermore, I agree with the district court that, under the circumstances of this case, appellant is not protected by a qualified immunity. In *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), the United States Supreme Court stated:

[T]he immunity defense [is] unavailing * * * if the constitutional right allegedly infringed by [petitioners] was clearly established at the time of their challenged conduct, if they knew or should have known of that right and if

they knew or should have known that their conduct violated the constitutional norm. *Id.* at 562, 98 S.Ct. at 860.

I agree with the district court that Atcherson's letter, protected under the First Amendment, was a substantial or motivating factor in Judge Siebenmann's actions with regard to Atcherson. I accept the findings and conclusions of the district court that the defendant failed to make an independent investigation and that he did not act in good faith.

The district court in my opinion, however, erred in reducing the attorney's fee sought by Atcherson's counsel on the cross-appeal. The fee should neither be denied nor reduced simply because the prevailing party is represented by a public interest group.

**11.** Our disposition of the principal appeal moots the cross-appeal (No. 78–1109) in which counsel for Ms. Atcherson seeks additional attorney's fees against Judge Siebenmann personally.

Whether attorney's fees should be awarded in connection with any further proceedings on the request for reinstatement is a matter that initially rests with the district court.