**Calvin FINCH, Appellant,**

v.

**Sharon WEMLINGER (now known as Sharon A'Flannigan), and Michael O'Donnell, Respondents.**

**No. C3-83-640.**

Supreme Court of Minnesota.

Feb. 8, 1985.

Stephen R. Hedges, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Catharine F. Haukedahl, Asst. Atty. Gen., St. Paul, for respondents.

KELLEY, Justice.

Appellant Calvin Finch, an unclassified employee in the Governor's Manpower Office (GMO), seeks damages under 42 U.S.C. § 1983 (1982) alleging he was wrongfully discharged by his superiors Sharon Wemlinger and Michael O'Donnell in retaliation for his exercise of his constitutional rights of free speech and petition. Following a jury verdict generally sustaining appellant's claims, the trial court held as a matter of law that respondents Wemlinger and O'Donnell were entitled to a "qualified immunity" and ordered entry of judgment in their favor. We affirm.

In 1977 appellant Finch served as director of the Balance-of-State Division of the GMO and in that capacity he administered federal funds under the Comprehensive Employment and Training Act (CETA). As an unclassified state employee, he served at the pleasure of his appointing authority. Finch was terminated from his position by his immediate supervisor, Sharon Wemlinger, on August 2, 1977. The circumstances of his firing form the basis of his claim under 42 U.S.C. § 1983 (1982).[1]

Immediately prior to the events at issue in this case, the Minnesota legislature merged several state agencies into a new department—the Department of Economic Security (DES) Act of June 2, 1977, ch. 430, 1977 Minn.Laws 1130. As a result of this consolidation, the GMO's funds and staff were merged into the new department. Michael O'Donnell was appointed to oversee this transition, effective July 1, 1977.

---

1. Finch originally alleged four causes of action. The trial court dismissed a claim made under Minn.Stat. 176.61–76 (1980) (PELRA); a claim brought under CETA—authorized legislation; and a claim brought against the State of Minnesota. On appeal from the order dismissing Finch's PELRA claim, we affirmed, but remanded to the trial court for trial of the claim alleged under 42 U.S.C. 1983 with directions. See *Finch v. Wemlinger,* 310 N.W.2d 66 (1981).

O'Donnell's permanent appointment as Commissioner of the DES was delayed until December 1, 1977 when the department was to become officially active.

In overseeing the transition, O'Donnell was responsible for merging several agencies and for meshing and realigning the programs in those agencies by December 1, 1977. As Commissioner, O'Donnell would have been Finch's future supervisor had Finch remained in state employ until after the merger was finalized. At the time of Finch's dismissal, however, O'Donnell was not technically Finch's appointing authority. Sharon Wemlinger was Acting Director of the GMO and was Finch's supervisor.

In midsummer 1977 Finch became concerned that some hiring practices in the GMO were politically motivated. He claims he was ordered by his superior to hire two persons who were unqualified and to retain and advance a probationary employee whose termination he had recommended. He was concerned that the apparent political patronage endangered the federal funding for the CETA program. He expressed his concern by protesting to his superior, Sharon Wemlinger, as well as to O'Donnell. In addition, on or about August 1, 1977, he contacted four state senators whose committee assignments related to the Department of Economic Security and informed them of what he deemed to be illegal employment practices in his division. The following day he was terminated by Wemlinger.

The trial court submitted a special verdict to the jury. In answer to verdict interrogatories, the jury found: (1) that on August 2, 1977 Wemlinger knew that Finch had contacted the four senators; (2) that Wemlinger had told O'Donnell about those contacts; (3) that O'Donnell caused Wemlinger to fire Finch; (4) Finch's contacts with the senators were a substantial and motivating factor in the firing of Finch; and (5) that Wemlinger and O'Donnell knew or should have known that the firing

of Finch because of his contacts would violate Finch's rights under the First Amendment to the United States Constitution.

Following post trial motions, the trial judge adopted the jury's interrogatory answers. However, he concluded as a matter of law that respondents Wemlinger and O'Donnell were immune from liability under the doctrine granting certain public officials a "qualified immunity". In doing so, the trial court acknowledged that appellant Finch had a constitutional right to communicate with the state senators relative to his concerns about the operation of the department, but that this right was not "clearly established" on August 2, 1977. Because the right was not "clearly established" on that date; and since the federal doctrine of qualified immunity was applicable, *see Finch v. Wemlinger*, 310 N.W.2d 66, 70 (1981); under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982),[2] the respondents were entitled to a qualified immunity against liability.

The broad issue posed by this appeal is whether the trial court correctly held that respondents were entitled to a qualified immunity. Resolution of this issue, in turn, demands consideration of several corollary issues. First, we must consider whether *Harlow v. Fitzgerald* fundamentally changed prior law. Next, we must decide whether the trial court properly overruled the jury's finding that respondents knew or should have known in 1977 that the firing of Finch because of his contacts with the senators would violate his First Amendment rights. Thirdly, we must consider whether *Harlow v. Fitzgerald* applies to this case. Finally, we must consider whether appellant's constitutional rights were "clearly established" in 1977 and whether respondent O'Donnell was acting within the sphere of his official responsibility.

■ Qualified immunity shields certain public officials from liability in actions

---

**2.** The instant case was tried in May 1982. *Harlow v. Fitzgerald* was decided on June 24, 1982, after trial, but before the court ruled on post trial motions.

brought under 42 U.S.C. § 1983 (1982). The rationale of the defense is that public officials with a broad range of duties and responsibilities must be able to execute those responsibilities without undue risk of civil liability.

In order to be entitled to the immunity prior to *Harlow v. Fitzgerald*, the government official had to satisfy both an objective and a subjective test. The objective element involved a presumptive knowledge of and respect for "basic, unquestioned constitutional rights." *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). The subjective element addressed the "permissible intentions", *id.*, or good faith of the government supervisor.

Aware that denying state[3] and federal[4] officials absolute immunity might submit them to harassing and disruptive civil litigation, the United States Supreme Court admonished judges to rule out frivolous claims through firm application of the Federal Rules of Civil Procedure. *See Butz v. Economou*, 438 U.S. 478, 507–08, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978).

Experience with the qualified immunity defense, however, proved it to be often ineffective in resolving suits on motions for summary judgment. If any factual dispute existed as to whether the official acted with malicious intent, or with a belief that a clear standard prohibited his/her conduct, that dispute required a subjective determination necessitating trial. *Harlow*, 457 U.S. at 814–15, 102 S.Ct. at 2736–37. The need for such determinations and the broad-range discovery they entailed often resulted in disruption of effective government. *Harlow*, 457 U.S. at 817, 102 S.Ct. at 2738.

Accordingly, *Harlow* redefined the qualified immunity defense to eliminate the subjective element. *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738–39. Other courts following *Harlow*, have dispensed with the subjective element of the qualified immunity

defense. *See Hobson v. Wilson*, 737 F.2d 1, 25 (D.C.Cir.1984); *Campbell v. Shearer*, 732 F.2d 531, 547 (6th Cir.1984); *Zweibon v. Mitchell*, 720 F.2d 162, 167–68 (D.C.Cir. 1983); *Schultz v. Sundberg*, 577 F.Supp. 1491, 1497 (D.Alaska 1984); *Truss v. Collier*, 574 F.Supp. 1249, 1261–62 (S.D.Ohio 1983); *Hauptmann v. Wilentz*, 570 F.Supp. 351, 370–371 (D.N.J.1983); *Jensen v. Conrad*, 570 F.Supp. 91, 100 (D.S.C. 1983). Under the new standard, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738–39. In that case, the court further explained:

> If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.

*Id.* at 818–19, 102 S.Ct. at 2739. In other words, if the trial judge determines that the law was not clearly established at the time the conduct occurred, the inquiry ceases. At that point, the official is entitled to summary judgment as a matter of law, and "[u]ntil this threshold immunity question is resolved, discovery should not be allowed." *Id.* at 818, 102 S.Ct. at 2738–39.

Because the difficulty in this case stems from the bipartite nature of the *Harlow* standard, it is important to make clear the inquiry required by *Harlow*. The *Hobson* decision, from the District of Columbia Court of Appeals, *supra*, clarifies this matter:

---

**3.** *See Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

**4.** *See Butz v. Economou*, 438 U.S. 478, 504, 98 S.Ct. 2894, 2909, 57 L.Ed.2d 895 (1978).

Step-by-step, the inquiry proceeds as follows: assume plaintiff alleges that defendant violated Right X, and defendant moves for summary judgment on grounds of qualified immunity, claiming Right X was not well-established when the alleged acts were committed and, alternatively, that extraordinary circumstances prevented him both from knowing and having reason to know the relevant legal standard. If the district court judge determines as a matter of law that Right X was well-established, a question of fact might still remain as to whether defendant reasonably neither knew nor should have known of it. The first issue is purely legal and should be susceptible to initial determination on the complaint and summary judgment papers. The latter is potentially an issue for trial, depending upon the unique circumstances of each case.

*Hobson v. Wilson,* 737 F.2d at 26–27 (footnotes omitted). In commenting on the latter defense, the *Harlow* court noted that this defense also "would turn primarily on objective factors." *See Harlow,* 457 U.S. at 819, 102 S.Ct. at 2739.

Examination of these cases demonstrates clearly that *Harlow* fundamentally changed the prior law by abolishing the subjective element of the qualified immunity test. *See also, Davis v. Scherer,* — U.S. ——, 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139 (1984).

■ We next consider whether the *Harlow* qualified immunity standard is applicable to this case. Since *Harlow* was a case arising on appeal from a summary judgment ruling, appellant contends that it is confined to that type of case but is inapplicable when, as here, a jury has found that respondent's conduct violated appellant's constitutional rights. While it is correct

that a number of appeals have arisen as the result of a trial court's granting or failure to grant a summary judgment,[5] we can ascertain no reason why the application of *Harlow* should be so restrictive.[6]

That the *Harlow* immunity standard applies in a procedural posture other than in the summary judgment context is demonstrated by *Hauptmann v. Wilentz,* 570 F.Supp. 351, 371 (D.N.J.1983); *Jensen v. Conrad,* 570 F.Supp. 91, 101 (D.S.C.1983). In both cases, the holding is that a court may address "the threshold immunity question" of whether the plaintiff acted pursuant to a clearly established constitutional or statutory right on a motion to dismiss. Admittedly, a motion to dismiss is very much akin to a motion for summary judgment. *See* Minn.R.Civ.App.P.—Rules 12.03 and 56.02. Applying *Harlow* in a motion to dismiss setting does further the policy of avoiding unnecessary litigation, whereas applying *Harlow* to the instant case will not further that policy. However, to order a remand at this point in this case, merely to resolve a threshold legal question, is contrary to the entire thrust of the *Harlow* decision, and its progeny, in shielding public officials from vexatious, harassing and disruptive civil litigation. *See Butz v. Economou,* 438 U.S. 478, 507–08, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978). Moreover, it has been held that a reviewing court may apply *Harlow* to immunity issues raised on appeal. *Hall v. United States,* 704 F.2d 246, 248–251 (6th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 508, 78 L.Ed.2d 698 (1983); *Silverman v. Ballantine,* 694 F.2d 1091 (7th Cir.1982). We see no merit to appellant's contention in this case that because respondents made no summary judgment motion, the issue of whether there was a clearly established constitutional right should, therefore, be triable by a

**5.** *See,* for example, *Buller v. Buechler,* 706 F.2d 844 (8th Cir.1983); *Green v. White,* 693 F.2d 45 (8th Cir.1982); *Wolfel v. Sanborn,* 691 F.2d 270 (6th Cir.1982), *cert. denied,* 459 U.S. 1115, 103 S.Ct. 751, 74 L.Ed.2d 969 (1983).

**6.** We note that *Harlow* is to be applied retroactively, and therefore applies to this case even though the trial occurred before June 1982. *See Wolfel v. Sanborn,* 691 F.2d at 272. *See also Windsor v. The Tennessean,* 719 F.2d 155, 163 n. 10 (6th Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984).

jury.[7] Secondly, even if it be conceded that *Harlow* normally applies in consideration of a summary judgment motion, in this case it would be unduly harsh and unfair to penalize the respondents for not making a summary judgment motion when the *Harlow* decision itself was handed down after the commencement of the trial. Moreover, application of the *Harlow* threshold immunity standard *after trial* is more beneficial to the appellant because he has had the opportunity for full discovery and presentation of facts to the trial court.

Having concluded that the *Harlow* standard is applicable to this case, we turn to examination of whether respondents performed their discretionary functions of firing Finch in violation of "clearly established" constitutional rights of which a reasonable person might have known in August 1977.[8] Respondents do not contend that exceptional circumstances exist to demonstrate that they reasonably neither knew nor should have known of the relevant legal standard. Therefore, we must determine whether the applicable law was well established in 1977. Respondents contend that appellant's constitutional right to complain to four state senators as a public employee was not "clearly established" in 1977. With that position the trial court agreed.

In *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), the United States Supreme Court required a balancing test be used in determining whether a public employee possessed free speech rights:

> The problem in any case is to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

The Court made clear that this test established only the basic parameters of a public employee's free speech rights:

> Because of the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors, against whom the statements are directed, to furnish grounds for dismissal, we do not d:em it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged. However, * * * we shall indicate some of the general lines along which an analysis of the controlling interests should run.

*Id.* at 569, 88 S.Ct. at 1735. Therefore, although *Pickering* does establish that public employees in certain circumstances may have constitutionally protected speech rights, it must be conceded the opinion does not by its terms define those rights with sufficient particularity to be deemed clear. In at least two respects, *Pickering* differs from this case. There, no question of maintaining discipline by immediate superior or harmony among co-workers was present. *Id.* at 570. Here, the trial court specifically found these two concerns implicated in the decision to terminate Finch. Moreover, in *Pickering* the court recognized that a close working relationship between superior and subordinate calling for trust, confidence, and loyalty would significantly alter the consideration of the court.

---

**7.** Appellant contends that when the issue of whether respondents "knew or should have known that termination of appellant would violate his constitutional rights" was submitted to the jury by consent of the parties, this procedure is conclusive. The issue, however, is one of law for the court, not the jury. It is not for the parties to consent which issues are for the court or for the jury. At the time of the trial of this case, it was arguably unclear whether the issue was for the court. *Harlow* cleared up that uncertainty.

**8.** Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate * * * But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences'. *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2739.

*Id.* In this case, the trial court found the existence of just such a relationship.

Appellant Finch relies on three post *Pickering* cases which, he claims, compels a finding that his activities were pursuant to a "clearly established" constitutional right, *Jannetta v. Cole*, 493 F.2d 1334 (4th Cir.1974), *Rosado v. Santiago*, 562 F.2d 114 (1st Cir.1977), and *Williams v. Anderson*, 562 F.2d 1081 (8th Cir.1977). In neither *Rosado* nor *Jannetta* was the speech in question disruptive of the employer's operation. In *Williams* the court, contrary to case at bar, found violations of unquestioned and "clearly established" constitutional rights. *Williams*, 562 F.2d at 1101–1102.

Respondents contend that various federal courts from 1975 to 1981 concluded that although an employee's speech was constitutionally protected, under the balancing test it was impossible to say that it was "clearly established" in the late 1970's. *Atcherson v. Siebenmann*, 605 F.2d 1058 (8th Cir.1979); *Hildebrand v. Board of Trustees of Michigan State University*, 662 F.2d 439, 443 (6th Cir.1981), *cert. denied*, 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 168 (1982). From those decisions, and others employing the balancing test, it appears that in 1977, at least, the exact parameters of the free speech rights of public employees was not clearly established. Therefore, the trial court correctly held respondents had a qualified immunity protecting against liability for damages under 42 U.S.C. § 1983.

■ Appellant likewise claims that respondent's conduct in firing him violated his clearly established statutory rights. This contention is presented for the first time on appeal and was never raised in the trial court. A question of law which was not presented to nor passed upon by the trial court cannot be raised on appeal. *Matter of Welfare of K.T.*, 327 N.W.2d 13, 16–17 (Minn.1982); *Republic National Life Insurance Co. v. Lorraine Realty Corp.*, 279 N.W.2d 349, 355 (Minn.1979); *Ronyak v. Pangerl*, 302 Minn. 556, 225 N.W.2d 533 (1975). Moreover, an examination of appellant's contentions in this regard clearly demonstrates them to be without merit.

■ Finally appellant claims O'Donnell is not entitled to a qualified immunity because at the time of the firing he was not acting within the scope of his official responsibilities. Courts have traditionally recognized that government officers should be accorded qualified immunity from personal liability for actions taken only within his/her sphere of official responsibility. *See Wood v. Strickland*, 420 U.S. 308, 318, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975); *Atcherson*, 605 F.2d at 1064; *See also Finch v. Wemlinger*, 310 N.W.2d 66, 70 (Minn.1981).

■ Starting July 1, 1977, respondent O'Donnell, who had been named Commissioner of the new Department of Economic Security, had been appointed to oversee the transition of existing departments, including GMO, into the new department. He was not to officially take over his duties as Commissioner until December 1, 1977. In the interim, appellant Finch's immediate supervisor was respondent Wemlinger, who had authority with respect to hiring and firing at GMO, and, in fact, she is the one who terminated Finch on August 2, 1977. At the trial and in post-trial motions, respondent O'Donnell contended that he should be dismissed from the case because of his claimed lack of authority. Notwithstanding his claim in that respect, the trial court found, in effect, that O'Donnell was acting in his official capacity of consolidating the GMO into the new department. We cannot conclude the trial court's ruling was clearly erroneous.

■ The scope of qualified immunity depends upon the scope of responsibilities of the office and all of the circumstances as they appeared at the time. *Finch v. Wemlinger*, 310 N.W.2d at 70. *See also Scheuer v. Rhodes*, 416 U.S. 232, 247–8, 94 S.Ct. 1683, 1691–92, 40 L.Ed.2d 90 (1974). It is clear that in the summer of 1977 O'Donnell was officially responsible for the success of the merger of several state agencies into the Department of Economic

Security. In order to make the transition a smooth one he, by necessity, had to use influence and inchoate power to further the success of the merger for which he was responsible. Obviously, this included resolving personnel problems. It cannot be said that his recommendation, or demand, that Finch be fired was without the scope of his official authority in setting up the DES. The trial court's determination is more than reasonably supported by the evidence.

Inasmuch as we conclude that the Court's Findings of Fact, Conclusions of Law and Order for Judgment must be affirmed, we do not address damage issues raised by appellant in this appeal.

Affirmed.