**JOHN DOES 1–100, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**Rod BOYD, Sheriff of Dakota County, Minnesota, William Henley, Richard Roberts, Max Moes 1–10 and Max Roe 1–10, Dakota County Deputy Sheriffs, and Maxine Moes 1–10 and Maxine Roes 1–10, Dakota County Deputy Sheriffs, the County of Dakota; Joseph Harris, Gerald Hollenkamp, John Voss, Steve Loeding, and Russell Streeftand, as Dakota County Commissioners; and Dakota County, Minnesota, a political subdivision, Defendants.**

No. Civ. 4–84–378.

United States District Court, D. Minnesota, Fourth Division.

July 31, 1985.

Charles S. Zimmerman, Barry G. Reed, Zimmerman, Caplan & Reed, Minneapolis, Minn., for plaintiffs.

Douglas J. Muirhead, Meagher, Geer, & Brennan, Minneapolis, Minn., Joseph B. Marshall, Circle Pines, Minn., Wayne Tritbough, Chadwick, Johnson & Condon, Bloomington, Minn., for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on plaintiffs' motions for partial summary judgment and class certification and on the defendants' motion for summary judgment.

**FACTS**

This action is a challenge under 42 U.S.C. § 1983 to the constitutionality of the Dakota County Sheriff's practice of strip searching all persons detained at the Dakota County Jail for traffic offenses, regulatory offenses, bench warrants, and misdemeanors. Plaintiffs seek preliminary and permanent injunctive relief, as well as damages. The Dakota County Jail is a two story facility located in Hastings, Minnesota, which houses both pretrial detainees and sentenced prisoners.[1] Pretrial detainees include persons charged with having committed misdemeanor or lesser offenses as well as individuals who have been arrested on felony charges. This case involves only those charged with having committed misdemeanors and lesser offenses.

There are five cell blocks in the Dakota County Jail.[2] Cell block one houses pretrial detainees; it has a maximum population of 18. All pretrial detainees are housed together, regardless of the seriousness of the crime. Detainees who are con-sidered dangerous, however, are sometimes separated from the general population and kept in a segregated area. Cell block two houses sentenced prisoners; it has a maximum population of 18. Cell block three houses the segregated prisoners referred to above; it has a maximum population of six. Cell block four houses up to six trustees or inmates involved in community service work. Cell block five houses women; it has a maximum population of six. The total capacity of the facility is 54.

When an individual is brought to the jail after arrest, he or she is "booked" into the facility on the first floor.[3] The booking procedure includes the completion of a criminal history sheet, the counting of the arrestee's money and inventorying of his or her property, the taking of photographs and fingerprints, and the completion of a form entitled "Dakota County Sheriff's Department Booking Officer's Visual Opinion." The latter form is designed to identify medical or drug/alcohol related problems, and includes an entry regarding the arrestee's potential for causing harm to himself or others. After these steps in the booking process are completed, each arrestee is subjected to a complete strip search. The strip search, pursuant to a written policy,[4] is conducted on every person who is detained at the facility, regardless of whether there is any cause to believe that the individual has concealed weapons or contraband on his or her person.

A private area called the "locker room" is used to conduct the strip searches. Only the detainee and the deputy sheriff are present during the search. Male deputies search male detainees and female deputies search female detainees. No standard in-

---

1. Sentenced prisoners may serve sentences of up to one year at the jail.

2. These cell blocks are located on the second floor of the facility.

3. Prior to entering the secured area on the first floor of the jail, the detainee may be subjected to a pat down search by either the arresting officer or one of the Dakota County Deputy Sheriffs. Such a search is not, however, required by the defendants as a matter of policy, and pat-down searches are not routinely con-ducted on detainees once they have entered the jail.

4. The written policy, which took effect on June 1, 1979, provides in pertinent part as follows: "Change out prisoner, give him a coverall and a pair of shower shoes, after a complete body strip search." Operating Procedures Handbook, at 6, ¶ D, Exhibit A to Affidavit of Dakota County Sheriff Rod Boyd, May 7, 1985. Prior to the promulgation of this written policy, strip searches were conducted on all detainees by the defendants pursuant to an unwritten policy.

structions are given regarding the scope of the strip search; neither the nature of the offense charged nor the detainee's prior criminal record are considered in determining how extensive a search will be conducted. The individual deputy conducting the search is given discretion regarding the manner in which the search is conducted.[5] The typical procedure for the search, however, is fairly clear. The detainee is first asked to take off his or her clothes, piece by piece, and hand them to the deputy for inspection. If the detainee refuses to disrobe, the clothing will be forcibly removed. After the detainee has disrobed, the deputy visually observes the detainee's genitals, inside of the ears and mouth, and hair.[6] The detainee is then asked to turn around, bend over, and spread his or her buttocks in order that the deputy may view the anus. In many cases, male detainees are also asked to manipulate their genitals. Finally, the deputy observes the bottom of the detainee's feet, and the detainee changes into jail clothing and is taken to the second floor of the facility. The strip search procedure is entirely visual; the Dakota County Sheriff's office instructs its deputies not to touch the detainee during the search.

There are no exact figures on the number of persons who are booked into the jail each year. Dakota County Jail Administrator Sgt. Richard Roberts testified in his deposition that between 1,900 and 2,500 persons are booked each year. Defendants have been unable to provide a breakdown of this figure into the percentages of those booked for misdemeanor or lesser violations and those booked for felonies. Accordingly, the exact size of the class which plaintiffs seek to have certified is not known at this time.

The Dakota County Jail maintains records of incidents of discovery of any contraband[7] during a strip search. The parties have reviewed these records for the past 11 years. During this period of time, there were 13 incident reports filed. Each report concerned the discovery of contraband in the clothing of the person strip searched; there is no evidence before the Court that contraband has ever been discovered in a body cavity during a strip search. In each instance the fruit of the search was drugs and related paraphernalia, although one search uncovered a razor blade in addition to drugs.

The named plaintiffs in this case were all arrested and held on minor offenses, and strip searched without any consideration of whether they might be in possession of contraband. In each case, the intake officer noted on the booking form that the detainee did not represent a threat to himself or others. John Doe # 1 [8] was arrested on a careless driving citation. He was detained at the Dakota County Jail for approximately two hours, until his stepfather posted $200 bail. John Doe # 2, the brother of John Doe # 1, was arrested on suspicion of drunk driving. John Doe # 3 was arrested as a result of a domestic

---

**5.** William Henley, the Dakota County Jail Administrator, testified at his deposition that the officer on duty has the discretion to determine whether or not the genitals are to be manipulated or the buttocks spread. Henley Deposition, at 62, 64. However, Richard Roberts, the Dakota County Jail Coordinator (Henley's subordinate), testified that the strip search procedure includes the spreading of the detainee's buttocks in order to allow the officer to view the detainee's anus. Roberts Deposition, at 39.

**6.** The detainees are asked to run their fingers through their hair to aid the deputies in their observation.

**7.** "Contraband" is used throughout this opinion to refer to weapons, drugs, or any other dangerous or prohibited item.

**8.** Plaintiffs have sued under assumed names because of the intimate and personal nature of their complaint. Plaintiffs stand ready to reveal their true identities in such manner and at such time as the Court deems appropriate. The description of the four named plaintiffs in this opinion is taken from plaintiffs' memorandum in support of the motion for partial summary judgment. Defendants have not objected either to the enumeration of the named plaintiffs or to the facts surrounding their strip search. The Court will therefore recognize these four as yet anonymous individuals as the plaintiffs and would-be class representatives.

dispute and was charged with disorderly conduct and disturbing the peace. She was detained for approximately two hours, and was then allowed to post bail from funds which she had already turned over to the deputy sheriffs. John Doe # 4 was arrested for driving while intoxicated and was held overnight. At his court appearance the next day, the court released him on his own recognizance.

Plaintiffs now move for class certification and partial summary judgment. Plaintiffs seek the Court's determination that the defendants' strip search policy violates the fourth amendment to the United States Constitution. Plaintiffs request that if the Court so determines, and certifies a class, an appropriate mechanism be established for a resolution of the damages claims of individual class members. Defendants have also moved for summary judgment, arguing first that the strip search policy is constitutional, second that defendant Dakota County Commissioners are entitled to summary judgment because they have never had any active responsibility for the Dakota County Jail, and third that all the individual defendants[9] are entitled to dismissal on the basis of qualified immunity. The Court will first discuss the constitutionality of the defendants' strip search policy and the defenses of the individual defendants. The Court will then examine the question of whether a class action is appropriate in this case.

## DISCUSSION

### A. *Summary Judgment*

Fed.R.Civ.P. 56(c) provides that summary judgment may be granted in favor of the moving party if there are no genuine issues as to material fact and if the movant demonstrates that it is entitled to judgment as a matter of law. The material facts in the case before the Court are not disputed by any of the parties, so that consideration of the legal questions on summary judgment is appropriate.

### 1. *Constitutionality of the Dakota County Strip Search Policy*

Plaintiffs claim that the defendants' strip search policy violates the fourth amendment to the United States Constitution, which provides in pertinent part that:

[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause....

The issue before the Court is therefore whether the defendants' strip search policy is reasonable under the circumstances.

■ A fundamental principle of fourth amendment jurisprudence is that as a general rule, searches of a person are generally impermissible absent a search warrant, which is to issue only on probable cause. *New York v. Belton,* 453 U.S. 454, 457, 101 S.Ct. 2860, 2862, 69 L.Ed.2d 768 (1981). The Supreme Court has, however, recognized that warrantless searches may be "reasonable" if they are compelled by exigent circumstances. *Id.* One such exception to the warrant requirement is the "search incident to arrest" rule. *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Under *Robinson,* a police officer making a lawful custodial arrest may conduct a "full search of the person." The Supreme Court in *Robinson* was concerned with whether a warrantless search could take place, rather than the scope of such a search. The search which was upheld in *Robinson,* however, was a thorough pat-down and an examination of the arrestee's pockets.

The search incident to arrest exception recognized in *Robinson* was extended in *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974). In *Edwards,* the Supreme Court held that "once the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized with-

9. The individual defendants are Dakota County Sheriff Rod Boyd, Deputy Sheriffs William Henley and Richard Roberts, unnamed deputy sheriffs, and Dakota County Commissioners John Voss, Steve Loeding, and Russell Streeftand.

out a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other." *Id.* at 807, 94 S.Ct. at 1239. The search upheld in *Edwards* was the arrestee's clothing, which was evidence of the crime. The Court's decision in *Edwards* did not, however, authorize searches unlimited in scope; it noted that police officers' conduct in carrying out the search was still subject to the general fourth amendment requirement of "reasonableness." *Id.* at 808 n. 9, 94 S.Ct. at 1239 n. 9. In upholding the search, the Supreme Court did comment that it followed "the established and routine custom of permitting a jailer to search the person who is being processed for confinement under his custody and control," and that "little doubt has ever been expressed about the validity or reasonableness of such searches incident to incarceration." *Id.* at 804–05 n. 6, 94 S.Ct. at 1237–38 n. 6 (citations omitted).

In *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983), the Supreme Court addressed the issue of whether police can, consistent with the fourth amendment, search the personal effects of an arrestee as part of the routine administrative procedure associated with booking and jailing suspects. The Court held that such searches are constitutional, and made the following comments regarding the scope of such searches:

> The governmental interests underlying a stationhouse search of the arrestee's person and possessions may in some circumstances be even greater than those supporting a search immediately following arrest. Consequently, the scope of the stationhouse search will often vary from that made at the time of arrest. Police conduct that would be impractical or unreasonable—or embarrassingly intrusive—on the street can more readily—and privately—be performed at the station. For example, the interests supporting a search incident to arrest would

hardly justify disrobing an arrestee on the street, but the practical necessities of routine jail administration may even justify taking a prisoner's clothes before confining him, *although that step would be rare.*

*Id.* 103 S.Ct. at 2609 (emphasis added). The Court in *Lafayette* made it clear that it was not reaching the issue of when the strip search of an arrestee would be appropriate. *Id.* at 2609 n. 2.[10]

The defendants in the present case do not make any attempt to argue that the strip searches in question are permissible under the search incident to arrest or search incident to detention lines of cases cited above. Such arguments were made and rejected by the courts in *Giles v. Ackerman,* 746 F.2d 614 (9th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985) and *Mary Beth G. v. City of Chicago,* 723 F.2d 1263 (7th Cir. 1983). The defendants' argument is essentially that there is an overwhelming need for security which outweighs any privacy interests arrestees may have, and that their strip search policy is a necessary deterrent to the introduction of contraband.

The Supreme Court applied fourth amendment analysis to the prison setting for the first time in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Plaintiffs in *Bell* were pretrial detainees at the Metropolitan Correctional Center (MCC), a federal short-term custodial facility in New York City designed to house primarily persons awaiting trial for federal criminal offenses. In addition to pretrial detainees, the MCC also housed some convicted inmates who were awaiting sentencing or transportation to a federal prison, as well as some individuals serving relatively short sentences. Plaintiff pretrial detainees brought a class action suit under 42 U.S.C. § 1983 challenging a number of prison conditions and practices, including the practice of conducting a complete body cavity strip search on inmates

---

**10.** The search at issue in *Lafayette* was of the detainee's pockets and shoulder bag. 103 S.Ct. at 2607.

following every contact visit with an individual from outside the facility. In a 5–4 decision, the Supreme Court held that under the circumstances, the strip searches at the MCC did not violate the fourth amendment.

The Supreme Court in *Bell* noted that while convicted prisoners and pretrial detainees do not lose all their constitutional protections by reason of their conviction and/or confinement, the fact of confinement and the legitimate goals and policies of penal institutions necessarily limits the constitutional rights of prisoners. 441 U.S. at 545–46, 99 S.Ct. at 1877–78; *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629 (1977). The Court specifically noted that this necessary limitation of constitutional rights applies to pretrial detainees and convicted prisoners alike. 441 U.S. at 546, 99 S.Ct. at 1877. Moreover, the Court recognized the maintenance of institutional security and the preservation of internal order and discipline as "essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." 441 U.S. at 546, 99 S.Ct. at 1878; *Pell v. Procunier*, 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Finally, the Court commented that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." 441 U.S. at 547, 99 S.Ct. at 1878.

The Supreme Court in *Bell* set forth the following balancing test for fourth amendment problems such as the one before it:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

441 U.S. at 559, 99 S.Ct. at 1884. There are two things to note about this test. First, consistent with traditional fourth amendment analysis, it is a fairly vague formulation which provides little specific guidance for individual cases. Second, the test embodies a recognition that fourth amendment analysis must proceed on a case-by-case basis, and that broad categorical rules must be eschewed. The plaintiffs are therefore correct in pointing out that the decision in *Bell* does not stand for the proposition that all strip searches in detention facilities are *per se* lawful. A number of decisions since *Bell* have struck down the constitutionality of policies requiring the strip search of all persons admitted to a detention facility, regardless of the seriousness of the offense or the likelihood that the person is carrying contraband. *See, e.g., Giles v. Ackerman*, 746 F.2d 614 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985); *Hill v. Bogans*, 735 F.2d 391 (10th Cir.1984); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir.1983); *Logan v. Shealy*, 660 F.2d 1007 (4th Cir.1981), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982); *Tinetti v. Wittke*, 620 F.2d 160 (7th Cir.1980), *aff'g* 479 F.Supp. 486 (E.D.Wisc. 1979); *John Does 1–100 v. Ninneman*, 612 F.Supp. 1069 (D.Minn.1985) (Devitt, J.). *See also Hunter v. Auger*, 672 F.2d 668 (8th Cir.1982) (practice of strip searching visitors to penal institution held to violate fourth amendment).

The Supreme Court's fourth amendment analysis in *Bell* was not extensive. The Court began by noting that "[a] detention facility is a unique place fraught with serious security dangers." 441 U.S. at 559, 99 S.Ct. at 1884. It then pointed to the record in the case before it and to other cases for evidence that inmates attempt to secrete contraband into prisons by concealing it in their body cavities. *Id.* The fact that there was only one documented instance in which an MCC inmate attempted to smuggle contraband into the facility on his person was interpreted by the Court as a testament to the effectiveness of the strip search policy as a deterrent. *Id.* The

Court concluded by recognizing that while the strip search represents a serious intrusion on personal privacy, such intrusion is outweighed by the "significant and legitimate security interests of the institution." *Id.* at 560, 99 S.Ct. at 1885.

■ In determining the constitutionality of defendants' strip search policy, the Court must balance the privacy rights of detainees against the asserted justification for the searches. Plaintiffs essentially argue that factors which distinguish this case from *Bell* require striking the balance between the intrusiveness of the search and the justification for the search in favor of the detainees' privacy. The starting point in the balancing test which the Court must conduct is a consideration of the scope of the search and the degree to which it intrudes on the individual's privacy.

There is no question that a full strip search represents a serious intrusion of privacy. The Court finds that the Dakota County strip search procedure, which is imposed across the board upon the whole spectrum of individuals in the community, young and old, male and female, is a dehumanizing, indecent, distasteful, and outrageous practice.[11] The experience of disrobing and exposing one's self for visual inspection by a stranger clothed with the uniform and authority of the state, in an enclosed room inside a jail, can only be seen as thoroughly degrading and frightening. Moreover, the imposition of such a search upon an individual detained for a lesser offense is quite likely to take that person by surprise, thereby exacerbating the terrifying quality of the event. Such an abhorrent and repulsive practice would be justifiable under only the most compelling circumstances, if the fourth amendment is to have any substantial meaning. Even the majority in *Bell* indicated that "this practice instinctively gives us the most pause" and that it did "not underestimate the degree to which these searches may invade the personal privacy of in-

mates." 441 U.S. at 558, 559–60, 99 S.Ct. at 1884, 1885–86. *See also id.* at 576–77, 99 S.Ct. at 1893–94 (body cavity searches "represent one of the most grievous offenses against personal dignity and common decency") (Marshall, J., dissenting); *id.* at 594, 99 S.Ct. at 1903 (body cavity search is "clearly the greatest personal indignity" and "may be the least justifiable measure of all [the security practices at the institution]") (Stevens, J., dissenting); *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1272 (7th Cir.1983).

Balanced against this invasion of personal privacy is the necessity for the searches in question. The defendants contend that the strip searches are necessary to prevent the introduction of contraband into the Dakota County Jail. Defendants further contend that the searches are necessary in order to detect lice, vermin, injuries, disease, and other health and sanitary conditions. Both parties focus their arguments on the first of these alleged justifications for the searches.

■ The Court finds that the incidence of attempts to introduce contraband into the Dakota County Jail is simply insufficient to justify an indiscriminate, across the board strip search policy. Plaintiffs make a persuasive statistical argument that the possession of contraband by new detainees at the jail is at worst an isolated problem. The defendants cannot point to a single instance in which contraband of any type has been found in the body cavity of a new detainee upon the initial strip search. Moreover, there have only been 13 incidents from 1973 to 1984 in which any contraband was discovered during a strip search; a conservative estimate of the number of strip searches during this period would be 20,000.[12] The incidence of contraband is therefore almost non-existent. Several courts have relied on less compelling statistical evidence to support their conclu-

---

11. One commentator has described the experience as a "visual rape." Shuldiner, *Visual Rape: A Look at the Dubious Legality of Strip Searches,* 13 J.Marsh.L.Rev. 278 (1980).

12. Defendants estimate that between 1,900 and 2,500 persons are booked into the Dakota County Jail each year. Over an 11 year period, therefore, between 20,900 and 27,500 persons have been strip searched in Dakota County. .

sion that across-the-board strip searches of *all* arrestees (including minor traffic offenders) violates the fourth amendment. *See Giles*, 746 F.2d at 617; *Mary Beth G.*, 723 F.2d at 1272–73.

Defendants refer to plaintiffs' statistical showing as a "negative sell technique." The absence of an event, according to defendants, is not proof that there is no justification for taking precautions to ensure against the occurrence of that event. In other words, the defendants make a deterrence argument. In support of this argument, defendants point to the following passage from *Bell* :

> That there has been only one instance where an MCC inmate was discovered attempting to smuggle contraband into the institution on his person may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises.

441 U.S. at 559, 99 S.Ct. at 1885. Defendants' reliance on this passage from *Bell* is misplaced. *Bell* can be distinguished on the ground that it involved contact visits between already incarcerated inmates and persons from outside the institution. The potential for planned smuggling in such a situation is obvious. By contrast, arrest and confinement at the Dakota County Jail are wholly unplanned events, so that the defendants' strip search policy can hardly be expected to deter smuggling.[13] *Giles*, 746 F.2d at 617. Moreover, the fact that the general public is not likely aware of the strip search policy makes it even less likely that the policy serves as a deterrent,[14] or that the invalidation of the policy by the Court would result in a wave of smuggling

attempts. The likelihood that someone arrested by police for a minor offense and then detained at the Dakota County Jail is carrying drugs in his body cavity is so remote that it cannot serve as a justification for full body strip searches.[15]

Defendants make two basic arguments in addition to those already discussed. First, defendants attempt to distinguish the court of appeals opinions relied upon by the plaintiffs, on the ground that in each of them there were aggravating facts or circumstances present which tipped the fourth amendment balance in favor of the plaintiff and against the strip search policy. This argument is based in part upon a misreading of the cases, and is wholly without merit. In only one of the four circuit court opinions did "aggravating circumstances" play a role in the decision. *Hill v. Bogans*, 735 F.2d 391 (10th Cir.1984). In *Hill*, the plaintiff was strip searched without a body cavity inspection, in a semi-public place. The Tenth Circuit found that the lack of privacy contributed to the intrusiveness of the search, but it can hardly be said that this was the determining factor in its decision to strike down the defendants' indiscriminate strip search policy. The circuit court decisions cited by the plaintiffs provide strong support for their position that the defendants' strip search policy is unconstitutional. *Giles v. Ackerman*, 746 F.2d 614 (9th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985); *Hill v. Bogans*, 735 F.2d 391 (10th Cir.1984); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir.1984); *Logan v. Shealy*, 660 F.2d 1007 (4th Cir.1981), *cert. denied*, 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982); *Tinetti v. Wittke*, 620 F.2d 160 (7th Cir.1980), *aff'g* 479 F.Supp.

---

**13.** Defendants point to one instance in which a prisoner convicted of major crimes coerced a minor offender on work release to smuggle a gun into the facility. Such an incident is insufficient justification for the defendants' strip search policy. The smuggler was already incarcerated and was coming in and out of prison on work release. This obviously presents a more serious problem than the booking of new detainees into the facility.

**14.** Richard Roberts, the Dakota County Jail Coordinator, testified at his deposition that no steps have been taken to publish the strip search policy or otherwise make the public aware of its existence. Deposition at 45.

**15.** Defendants' argument that in the absence of a blanket strip search policy individuals could "arrange to be arrested" on minor charges in order to smuggle drugs or other contraband to DCADC inmates is too far-fetched to serve as the basis for upholding the policy.

486 (E.D.Wisc.1979). In each of these decisions, the plaintiff was arrested for a traffic or other minor offense, and was strip searched pursuant to a uniform policy. In each case, the court held that such a search, conducted without reference to the nature of the offense or any reasonable grounds to believe that the individual possessed contraband, violated the fourth amendment. The decisions cited by the plaintiffs are therefore directly on point to the instant case.

Defendant's second argument is that the strip search is necessary because there is substantial commingling of minor offense detainees with other, more dangerous offenders. This commingling is of two types. First, the Dakota County Jail houses all detainees together, regardless of whether they have committed a regulatory offense, a misdemeanor, or a felony. Second, defendants contend that detainees and sentenced prisoners are commingled from time to time. The latter argument is not persuasive. Detainees and sentenced prisoners are housed in totally segregated cell blocks. There is no indication in the record that any contact between the two groups is more than *de minimus.*

■ The commingling of all detainees, regardless of the nature of the charge, presents a slightly more substantial problem. Plaintiffs claim that the defendants could solve the problem by segregating minor and misdemeanor detainees from felony detainees by placing them on different cell blocks. Plaintiffs do not, however, specifically describe how this could be accomplished given the current configuration of the jail.[16] Nevertheless, the commingling of detainees does not mandate a finding that the defendants' strip search policy is constitutional. At least one court has recognized that commingling is only one factor to be considered in the fourth amendment balance. *Smith v. Montgomery County, Md.,* 547 F.Supp. 592, 598–99 (D.Md.1982). Moreover, any danger associated with commingling is minimized by the fact that a detainee's arrest is an un-

planned event. The danger of smuggling is therefore wholly insubstantial. Further, methods can be devised by defendants to minimize commingling.

■ In sum, the Court finds that the fourth amendment balance should be struck in favor of the privacy interests of the plaintiffs. While the need to ensure jail security is a legitimate interest, the strip searches of lesser offenders as a matter of policy bears such an insubstantial relationship to security needs that, when balanced against the severe intrusion on plaintiffs' privacy rights, the searches are not "reasonable." The particular plaintiffs in the instant case were lesser offenders who gave no indication of posing a risk to themselves or to others within the jail. The defendants had no objective reason to believe that any of the plaintiffs were carrying contraband. Under these circumstances, a complete strip search was not justified.

■ The reasonableness standard of the fourth amendment requires, "at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test." *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979) (footnotes omitted). The more intrusive the search, the closer governmental authorities must come to demonstrating probable cause for believing that the search will uncover the objects for which the search is being conducted. *Terry v. Ohio,* 392 U.S. 1, 18 n. 15, 88 S.Ct. 1868, 1878 n. 15, 20 L.Ed.2d 889 (1968). In order to conduct a search, there must be "individualized suspicion, specifically directed to the person who is targeted for the strip search." *Hunter v. Auger,* 672 F.2d at 675 (8th Cir.1982). In the instant case, the defendants should not conduct strip searches of detainees accused of minor offenses or misdemeanors unless they have some objective, reasonable suspicion that the individual is in possession of contra-

---

**16.** The Court notes, however, that the defendants house up to six detainees at a time in a separate cell block designed for dangerous or troublesome individuals.

band. This suspicion could be based on the nature of the offense, the detainee's criminal history, the demeanor of the individual, and the results of any other search, such as a metal detector or pat down, which the defendants may choose to conduct.

### 2. Qualified Immunity

■ The individual defendants claim that they are entitled to summary judgment on the basis of qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The qualified or "good faith" immunity is an affirmative defense that must be pleaded by a defendant governmental official. *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Until recently, the decisions of the United States Supreme Court had established that the qualified immunity defense had both objective and subjective components. Under the Court's decision in *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975), the objective element embodies a presumption that officials understand and respect "basic, unquestioned constitutional rights." The subjective element embodies an inquiry into whether the official "took the action with the malicious intention to cause a deprivation of constitutional rights or other injury...." *Id.* at 322, 95 S.Ct. at 1001.

In *Harlow v. Fitzgerald*, the Supreme Court substantially modified the qualified immunity defense in actions under section 1983.[17] The Supreme Court set forth the following test for qualified immunity:

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

457 U.S. at 818, 102 S.Ct. at 2738. The above formulation completely eliminates the subjective component of the qualified immunity defense. The Court modified the defense in this manner because "[t]he subjective element of the good-faith defense frequently has proved incompatible with our admonition ... that insubstantial claims should not proceed to trial." *Id.* at 815–16, 102 S.Ct. at 2736–37. The expansion of the immunity defense was premised in large part on the concern that civil rights suits impose a heavy burden on government:

> [C]laims [against federal or state officials] frequently run against the innocent as well as the guilty—at a cost not only to the defendant officials, but to the society as a whole. These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office.

*Id.* at 814, 102 S.Ct. at 2736.

■ The Supreme Court in *Harlow* stated that the purely objective test which it had created would help to avoid the excessive disruption of government by resolving many insubstantial claims on motions for summary judgment. On such a motion, a court should determine the currently applicable law and whether that law was "clearly established" at the time of the alleged violation. The basic idea behind such an inquiry is to refuse to impose liability on officials who could not have reasonably been expected to know that they were engaging in unlawful conduct; officials should not be required to anticipate subsequent legal developments. *See Finch v. Wemlinger*, 361 N.W.2d 865 (Minn.1985) (application of *Harlow* immunity test).

17. *Harlow* was a *"Bivens"* action rather than a section 1983 action. While claims against state officials for violations of constitutional rights are brought under section 1983, similar claims against federal officials may be brought in federal court under the Supreme Court's decision in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The Supreme Court has held that it is "untenable" to distinguish between section 1983 suits and *"Bivens"* suits for the purposes of immunity actions. *Butz v. Economou*, 438 U.S. 478, 504, 98 S.Ct. 2894, 2909, 57 L.Ed.2d 895 (1978). Moreover, the Supreme Court's discussion of qualified immunity in *Harlow* was explicitly made applicable to suits under section 1983. *Harlow*, 457 U.S. at 818 n. 30, 102 S.Ct. at 2738 n. 30.

■ The individual defendants in the present case are immune from liability under the test for qualified immunity set forth in *Harlow.* The law on strip searches in detention facilities was established by the Supreme Court's decision in *Bell v. Wolfish* in 1979. As the discussion in this Memorandum and Order has indicated, *Bell* dealt with searches following contact visits from persons outside the institution, and is therefore clearly distinguishable from the present case. Moreover, the fourth amendment analysis in *Bell* was a general test that does not yield a clear answer to issue of the constitutionality of strip searches in other settings. *Cf. Finch v. Wemlinger,* 361 N.W.2d at 870–71. Finally, there have been no subsequent Supreme Court decisions on strip searches, and the Eighth Circuit has not yet examined the issue in this case.[18] These factors led another court in this District, in a virtually identical case to the one before the Court, to conclude that the individual defendants did not violate "clearly established constitutional rights" by implementing a strip search policy. *Jane Does 1–100 v. Donald Omodt,* CIVIL 3–83–468, (D.Minn. Sept. 27, 1984).

In support of their contention that the individual defendants violated a clearly established right, plaintiffs point to the several circuit court opinions that have struck down policies which require the indiscriminate strip searching of all detainees. While it is true that the Fourth, Seventh, Ninth, and Tenth Circuits have so held, they did so in 1981, 1983, 1984, and 1985, respectively. This area of the law is obviously a developing one, and it cannot yet be said that clearly established rights have been developed as a result.

■ Finally, plaintiffs claim that defendants admit that they did not balance the legal rights of the detainees against the institution's security interests, as required by *Bell,* and that they therefore acted in reckless disregard of plaintiffs' constitutional rights. Accordingly, plaintiffs contend that the individual defendants may not claim qualified or "good faith" immunity. Plaintiffs appear to be referring in part to the fact that the defendants have admitted that they did not consider the use of alternative measures to secure the safety of the facility. In light of the lack of clarity in the law, and Supreme Court's language in *Bell* regarding the need to defer to legitimate correctional security goals, this fact is not sufficient to defeat the individual defendants' qualified immunity defense. Accordingly, the Court will grant summary judgment in favor of all of the individual defendants.[19]

### 3. *Liability of Dakota County*

■ Plaintiffs have argued, and defendants concede, that the strip search policy at the Dakota County Jail is a Dakota County policy such that the county is liable under 42 U.S.C. § 1983. *Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). The practice of strip searches stems from a written "Operating Procedures Handbook" of the Dakota County Sheriff, and so is clearly a local government policy.

### B. *Class certification*

Plaintiffs define the class they seek to represent as follows:

All persons who have been detained by Dakota County in its adult detention facility or facilities, prior to adjudication, on suspicion of committing a misdemean-

---

**18.** The Eighth Circuit has, however, held that strip searches of visitors to penal institutions without reasonable suspicion of smuggling violates the fourth amendment. *Hunter v. Auger,* 672 F.2d 668 (8th Cir.1982).

**19.** The County Commissioner defendants are also entitled to summary judgment because they were not actively involved in the operations of the Dakota County Jail, breached no duty of care under which they could be held vicariously liable (*e.g.* negligent hiring or failure to train), and cannot be held liable based on respondeat superior. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiffs do not contest defendants' contentions regarding the County Commissioners.

or or lesser offense, who have been strip searched as a matter of policy, and without consideration of the likelihood that they have weapons or other dangerous contraband concealed on their person for the period from January 1, 1977 to the present, inclusive.

 Fed.R.Civ.P. 23(a) sets forth four prerequisites to the maintenance of a class action:

(1) the class is so numerous that joinder of all members is impracticable,

(2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representative parties will fairly and adequately protect the interests of the class.

The party seeking to represent the class bears the burden of establishing that all four requirements are satisfied. *Smith v. Merchants & Farmers Bank of West Helena*, 574 F.2d 982 (8th Cir.1978). Prior to considering the criteria set forth under Rule 23(a), the Court must find that a precisely defined class exists, *Roman v. ESB, Inc.*, 550 F.2d 1343, 1348 (4th Cir. 1976) and also that the class representative(s) is a member of the class. *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977) ("class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members"). These requirements are implicit prerequisites to the maintenance of an action under Rule 23.

If plaintiffs satisfy the implicit and explicit requirements of Rule 23(a), they then must demonstrate that the action sought to be certified falls within one of the three categories set forth in Rule 23(b). Plaintiffs contend that this action may be properly maintained as a class action under either Rule 23(b)(2) or 23(b)(3). Defendants do not argue that plaintiffs have failed to meet the requirements of 23(a), but rather oppose the motion for class certification on the ground that a class action is not proper under Rules 23(b)(2) or (b)(3).

### 1. *Rule 23(a) requirements*

 Plaintiffs have clearly satisfied the requirements of Rule 23(a).[20] First, plaintiffs have demonstrated that the class is so numerous that joinder of all members is impracticable. Fed.R.Civ.P. 23(a)(1). While plaintiffs have offered no specific proof as to the number of people in the proposed class, many hundreds of individuals have clearly passed through the Dakota County Jail during the past eight years. Second, there are common questions of law and fact in this case, since the defendants follow a uniform policy with respect to strip searches that affects all members of the class. Fed.R.Civ.P. 23(a)(2). Third, defendants do not dispute the fact that the class representative's claims are typical of the class claims. The class representatives were arrested for traffic and other minor offenses, and were subjected to the same strip search that all class members were subjected to. There is nothing on the face of the complaint which suggests that the named plaintiffs' experiences were unusual in any way. Plaintiffs have therefore satisfied the typicality requirement. Fed.R.Civ.P. 23(a)(3). Finally, it seems clear that the class representative will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a)(4). There are no apparent conflicts between the interests of the named plaintiffs and the rest of the class, and plaintiffs' counsel has experience in class litigation.

### 2. *Rule 23(b)(2)*

 Plaintiffs contend that this suit may be properly maintained as a class action under Rule 23(b)(2), which permits such an action where:

[T]he party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or cor-

---

**20.** The proposed class is precisely defined, and the class representatives are members of the proposed class. The plaintiffs have therefore satisfied the implicit requirements of Rule 23.

responding declaratory relief with respect to the class as a whole. . . .

Rule 23(b)(2) was specifically designed to allow for the class action mechanism in civil rights cases. *See* Advisory Committee's Note to 1966 Amendment to Rule 23, 39 F.R.D. 98, 102 (1966). The requirements of the rule are accordingly given a liberal construction in civil rights suits. *Coley v. Clinton*, 635 F.2d 1364, 1379 (8th Cir.1980). *Coley* held that where the requirements of Rule 23(a) have been met, a district court's discretion to deny class certification on the basis of Rule 23(b)(2) is limited. *Id.* at 1378.

Plaintiffs' argument for class certification under this section of the rule is simple and straightforward. Plaintiffs point out that defendants' strip search policy is uniformly applied to all class members, and that plaintiffs seek permanent injunctive relief with respect to this policy. They argue that they are accordingly entitled to class certification.

■ Defendants do not argue that they have not acted on grounds generally applicable to the class. Rather, they argue that plaintiffs lack standing as individuals and as a class to seek injunctive relief in this case. Defendants contend that since plaintiffs cannot meet the threshold requirement of standing, injunctive relief is not appropriate, and that class certification is therefore improper under Rule 23(b)(2). The standing requirement is derived from the command in Article III of the Constitution that federal courts are to decide only actual cases or controversies. *Flast v. Cohen*, 392 U.S. 83, 94–101, 88 S.Ct. 1942, 1949–53, 20 L.Ed.2d 947 (1968). In order to satisfy this requirement, a plaintiff must demonstrate that he has a "personal stake in the outcome" in order to "assure that concrete adverseness which sharpens the presentation of issues" necessary for the proper resolution of constitutional questions. *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). A plaintiff must show that he or she has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct, and the injury or threat of injury must be both "real and immediate," not "conjectural" or "hypothetical." *See, e.g., Golden v. Zwickler*, 394 U.S. 103, 109–10, 89 S.Ct. 956, 960–61, 22 L.Ed.2d 113 (1969).

■ Defendants rely primarily on the Supreme Court's recent decision in *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). The plaintiff in *Lyons* challenged a Los Angeles police department policy of applying "chokeholds" to arrestees. The plaintiff alleged that he was stopped for a traffic violation and that the police officer applied a chokehold without provocation. He sought injunctive and declaratory relief against the police department, as well as damages. The Supreme Court held that the plaintiff lacked standing to seek injunctive relief, and that he also failed to establish the basic prerequisites for equitable relief, since he was unable to show that he was likely to suffer future injury from the use of chokeholds by police officers. 103 S.Ct. at 1667. The fact that the plaintiff had previously been choked, according to the Supreme Court, while affording plaintiff standing to seek damages, did not help to establish that he would be stopped for a traffic violation and choked again. *Id.* Moreover, the Court held that the emotional consequences of this prior act were an insufficient basis for an injunction, absent a real and immediate threat of future injury by the defendant. *Id.* at 1668 n. 8. In order to have established an actual controversy in *Lyons*, the plaintiff would have had to make credible allegations that (1) he would have another encounter with the police, and (2) all Los Angeles police always choke any citizen with whom they have an encounter. *Id.* at 1667. The Supreme Court found that it was "surely no more than speculation" that plaintiff would be stopped *and* choked by the police again. *Id.* at 1668.

Defendants also cite *Smith v. Montgomery County, Md.*, 573 F.Supp. 604 (D.Md. 1983), a decision almost directly on point to the case before the Court. The plaintiff in

*Smith,* like the plaintiffs in the instant action, was challenging the constitutionality of indiscriminate strip searches at a county detention facility. The district court, relying primarily on the Supreme Court's decision in *Lyons,* held that the plaintiff lacked standing to seek injunctive relief against the detention center's strip search policy. *Id.* at 608. The court noted that the plaintiff did "not allege, nor could she credibly allege, that she will be arrested in the future and strip searched without probable cause to believe she is carrying weapons or contraband." *Id.* Given its finding that the plaintiff lacked standing with respect to injunctive relief, the court in *Smith* denied plaintiff's motion to certify a class action pursuant to Rule 23(b)(2).

While the Court is reluctant to hold that plaintiffs do not have standing to seek injunctive relief against defendants' blanket strip search policy, the defendants' argument is persuasive. The instant case does differ from the Supreme Court's decision in *Lyons* in one major respect. While the plaintiff in *Lyons* could not credibly allege that all encounters with police resulted in chokeholds, *every* detainee at the Dakota County Jail is strip searched upon entry. There is no conjecture with respect to the likelihood that a detainee will be strip searched. While much of the Supreme Court's analysis in *Lyons* focused on the likelihood that police would again decide to apply a chokehold, however, the Court also rested its decision on the fact that the plaintiff could not demonstrate that he was likely to be stopped or arrested again. In *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), a challenge to discriminatory conduct in the administration of a county criminal justice system, the Supreme Court looked to this same factor in holding that the plaintiffs lacked standing to seek an injunction:

> ... here the prospect of future injury rests on the likelihood that respondents will again be arrested for and charged with violations of the criminal law and

will again be subjected to bond proceedings, trial, or sentencing before petitioners. ... We assume that respondents will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct said to be followed by petitioners.

414 U.S. at 496–97, 94 S.Ct. at 676–77. While plaintiffs in the instant case, then, can show that *if* they are arrested and detained again they will be strip searched, they cannot show any likelihood that they will in fact be arrested again.

The facts of this case are distinguishable from similar cases in which the restrictive standing rules established in *Lyons* and *Littleton* have been bypassed. In *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 1857 n. 3, 75 L.Ed.2d 903 (1983), the Supreme Court held that a plaintiff who had been stopped by the police on 15 occasions in two years had standing to seek injunctive relief in a challenge to a state vagrancy statute, since he could show a "credible threat" that he might be detained again under the statute. *See also Lake v. Speziale,* 580 F.Supp. 1318 (D.Conn.1984) (plaintiff who had been incarcerated on two previous occasions for contempt for failure to meet child support obligation had standing to challenge contempt procedures in light of plaintiff's poverty and likelihood of future proceedings). In the instant case, the named plaintiffs cannot establish a "credible threat" that they will be arrested again. There has been no allegation of a pattern of arrests, as in *Lawson,* which would support such a finding. Accordingly, plaintiffs' motion for class certification pursuant to Rule 23(b)(2) will be denied, since plaintiffs do not have standing to pursue injunctive relief.

### 3. *Rule 23(b)(3)*

Plaintiffs also contend that this suit may be properly maintained as a class action under Rule 23(b)(3), which permits such an action where:

the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### a. *Predominance*

Professors Wright and Miller succinctly state the general standards for the predominance prong of the Rule 23(b)(3) inquiry:

The common questions need not be dispositive of the entire action. In other words, "predominate" should not be automatically equated with "determinative" or "significant." Therefore, when one or more of the central issues in the action are common to the class and can be said to predominate, the action will be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately....

On the other hand, if the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate.... [W]hen individual rather than common issues predominate, the economy and efficiency of class action treatment are lost and the need for judicial supervision and the risk of confusion are magnified.

C. Wright & A. Miller, *Federal Practice and Procedure*, § 1778, at 54–56.

■ In the instant case, plaintiffs claim that the following questions of law and fact predominate in this litigation: the scope of defendants' strip search policy, the policy's legality, the reasonableness of the policy, and the good faith of the individual defendants (including the defendants' belief in the legality of the policy and the reasonableness of that belief). Moreover, plaintiffs claim that there are common questions with respect to damages, the one issue in this case that will pose individualized problems of proof. These questions would include, according to plaintiffs,

whether the Court can presumptively award non-nominal compensatory damages and whether plaintiffs are entitled to punitive damages.

The Court finds that the common questions in this question are sufficient to predominate. There are clearly a number of significant factual and legal questions which are common to the entire class. Defendants do not focus their opposition to plaintiffs' effort to certify a Rule 23(b)(3) class on the predominance inquiry, although they do suggest in somewhat summary fashion that the individual issues with respect to alleged injuries and damages in this case predominate. The crucial issue with regard to this motion is the second prong of Rule 23(b)(3): whether the class action mechanism is "superior to other available methods for the fair and efficient adjudication of the controversy."

### b. *Superiority of Class Action Method of Adjudication*

Plaintiffs argue that the maintenance of this suit as a class action would be more efficient than allowing each individual class member to bring separate suits for damages. Plaintiffs contend that the individual damage calculations could be handled by reference to a magistrate or to a special master pursuant to Fed.R.Civ.P. 53. Defendants argue that given the large amount of damages requested for each plaintiff, individual damages actions would be both more fair and more efficient.

Plaintiffs' proposal for adjudicating the damages claims of the individual class members is not without significant costs. While there are no precise figures on the size of the class, it appears to number in the thousands. It would obviously be quite expensive to identify these class members, notify them of their right to assert a claim, and provide for a special master to hear the claims. The establishment of such a mechanism would make sense as a matter of judicial economy only if there was a significant possibility that the average member of

the proposed class would receive a substantial damages award.

The Eighth Circuit, however, in *Hunter v. Auger*, 672 F.2d 668 (8th Cir.1982), has spoken on the subject of the appropriateness of substantial damages awards in strip search cases. In *Hunter*, a case involving a strip search of prison visitors, the Eighth Circuit found that while the plaintiffs' fourth amendment rights were violated, they were entitled to an award of no more than nominal damages:

> We note that there is no evidence that appellants here were subjected to repeated incidents that intruded on fourth amendment protections. Each complaint is based on one episode. Moreover, we believe that appellants' fourth amendment rights are fully vindicated here by the grant of declaratory and injunctive relief. Accordingly, we direct the district court, on remand, to allow nominal damages.

672 F.2d at 677. In light of the above comments, the Court has determined that it would not be a prudent use of judicial resources to certify a class for damages pursuant to Rule 23(b)(3). Plaintiffs' motion for class certification will therefore be denied.

## CONCLUSION

 Prison and jail administrators are entitled to a significant degree of deference when it comes to the administration of their facilities, but federal courts must not totally abdicate their responsibility to uphold the requirements of the Constitution. In the present case, the defendants' indiscriminate strip search policy of all detainees who enter the Dakota County Jail is an exaggerated security measure which cannot be justified in light of all the circumstances and the seriousness of the privacy interests at stake. The Court is appalled that at this stage of civilized society citizens accused of minor infractions of the law should be forced to undergo such treatment by their government, absent some specific need demonstrated in an individual case. In the case of misdemeanor and lesser offenders, the defendants must demonstrate some individualized suspicion in order to conduct such an intrusive search. The defendants searched these plaintiffs without such individualized suspicion, and therefore violated the fourth amendment.

Accordingly, IT IS ORDERED that:

1. plaintiffs' motion for class certification is denied;

2. plaintiffs' motion for partial summary judgment is granted as follows:

 a. defendants' policy of strip searching all individuals detained at the Dakota County Jail for misdemeanors and lesser offenses, regardless of the character of the offense, and regardless of whether there is a suspicion that the individual is in possession of contraband, violates the fourth amendment to the United States Constitution and should be immediately discontinued; and

 b. the strip searches of the individual named plaintiffs violated their fourth amendment rights; and

3. defendants' motion for summary judgment is granted to the extent that the individual named defendants, but not Dakota County, are immune from liability for damages.

There is no evidence before the Court of particularized damages by any of the named plaintiffs. The question of damages remains before the Court, or for resolution by the parties themselves.